## CLIFFORD HARE v. STATE.

No. A-8964.   Feb. 7, 1936.
(54 Pac. [2d] 670.)

Coffey, Seaton & Coffey, for plaintiff in error.

Mac Q. Williamson, Atty. Gen. (Eldon J. Dick, of counsel), for the State.

DOYLE, J.   In the information in this case, filed in the district court of Tulsa county, Clifford Hare was charged with the crime of murder, alleged to have been committed in said county on or about the 12th day of November, 1934, upon the body of William Mushrush, by shooting him with a rifle.   Upon his trial the jury returned their verdict finding the defendant guilty of manslaughter in the first degree, and assessed his punishment at imprisonment for a term of fifteen years.   February 8, 1935, the court pronounced judgment and sentenced the defendant to imprisonment in the state reformatory at Granite for a term of fifteen years.   From this judgment, he appeals.

The defendant admitted the killing, but contended that the homicide was justifiable in self-defense, or, more definitely stated, in defense of his mother and himself.

The theory of the state is that it was a deliberate wanton murder.   There is very little conflict in the testimony of the witnesses for the state and those of the defendant; the undisputed facts are as follows:

The defendant, a young man twenty years of age, was at the time living with his mother, brother, and a sister on a farm adjoining the public highway, between the towns of Sperry and Skiatook, as tenant farmers.   The defendant and his brother visited their father, living in Delaware county, returning on the night of November 3,

1934; they had a car collision on the Grand River Bridge, near Salina, and the defendant received severe injuries, including a broken arm, lacerations on his legs, and was rendered unconscious. Removed to the Morningside Hospital in Tulsa, he regained consciousness the following morning. On November 11th, he left the hospital, returning to his home. On the afternoon of the following day, while in bed, he was called by his sister, saying that some people were picking pecans on the place. His mother had gone to the orchard, and he took a 22 rifle and followed her.

The state called Mrs. Mushrush, widow, and Mrs. J. M. Mushrush, mother of the deceased, Newton S. Hughes, and Frances Cremin, and their testimony was to the effect that on the afternoon of November 12th, Armistice Day, the deceased with his wife and children, his mother, and Miss Frances Cremin, were on a pleasure drive looking for persimmons.

The Mushrush family and Newton S. Hughes had been friends for a number of years. Mr. Hughes was employed as a pumper on an oil lease on and near the same land occupied by the defendant and his mother. Passing a private road leading from the main highway to Mr. Hughes' home, about a quarter of a mile from the road, they decided to drive into Mr. Hughes' house and ask him where they could find some persimmons. While on this private road, the children, seeing pecans nearby, asked their father to stop and let them gather some. He stopped the car and they all got out, and were picking pecans. The defendant's mother, seeing them in the pecan grove, ran toward where they were; they, seeing her coming, returned to the car and drove on to the Hughes home, sounded the horn, then drove around the house and started back to-

wards the main highway. The defendant's mother was standing in the road waving a club; the deceased, unable to drive by her, drove to the side of the road to avoid hitting her and stopped. She then threw her club at the car, but missed it. The testimony tends to show that she was much agitated and very abusive in her language.

The deceased suggested to his family, perhaps he had better get out and talk to her, which he did. She picked up another club or stick and attempted to strike him with it; he held her hands and tried to reason with her; he then released her hands and started to his automobile, and as he was about to enter it a shot was fired by the defendant from a point 75 yards away, which struck him in the hip, mortally wounding him. The defendant then came to the car and made threats to shoot and kill. His mother finally prevailed upon him to permit the deceased and his family to drive on away. The defendant saying, "Get to hell out of here and stay out." The deceased drove his car to Tulsa and was taken to the hospital, where he died a few days later.

Newton S. Hughes testified that he lived on the lease near the property upon which the Hare family have an agricultural lease; that he built a private road going directly west from the paved highway to his house; that he was working at a well and saw Mr. Mushrush drive the car to his house and then "blow the horn a couple of times," and saw the car turn back toward the main highway; meeting Mrs. Hare Fowler in the road, the car stopped. Saw Mr. Mushrush get out of the car and appeared to be talking to Mrs. Fowler; that he saw something in her hand and saw some commotion going on. Next he saw the deceased holding her hands. Then he saw the defendant going through the brush with a gun, saw him

fire the gun; that at the time Mr. Mushrush was shot he had one foot on the running board, getting into the car, and Mrs. Fowler was seven or eight feet from Mr. Mushrush, at the time he was shot; that he saw the defendant go up to the car after Mr. Mushrush had started to drive away and he stopped the car, but he was too far away to hear the conversation which took place.

Flay McDonald, deputy sheriff, testified that he had a conversation with the defendant in the sheriff's office after he was arrested, as follows:

"I asked him if he intended to shoot that man and he said: 'What the hell do you think I shot for if I didn't intend to hit him.' I said: 'You surely did not intend to kill a man for picking up pecans did you?' He said, 'Well, the sons of bitches have got to be weaned sooner or later, and if you have to have a killing, it might as well come now as later.' "

Dr. Fred A. Glass testified that he was a surgeon, and as such attended William Mushrush; that he died from the effects of a bullet wound in the left hip, which punctured the intestines and lodged in the bladder.

On the part of the defendant, Mrs. Bessie Fowler, mother of the defendant, testified, that when the deceased and his family got in their car and started in the direction of the Hughes home, she followed them, thinking they were going back in to the pecan orchard as others had done, and that she followed, going in the middle of the road; that the deceased, in front of Mr. Hughes' house, sounded his horn once, then drove around behind the house, stopped, and sounded his horn again, but did not wait for a response and came on up the road towards her, and that when she saw him coming she picked up a little club and tried to wave him down; that he stepped on the

gas and rushed towards her as if to run over her, and when within a short distance she stepped out of the road to the south side and threw a stick at the headlights; that he jumped out and came around the car cursing her, and after an exchange of words he got back in the car. She informed him that she was going to get his license tag number to see what could be done about people trespassing and stealing pecans, and he got out of the car again and started striking her, hitting her three times about the face and arms; that after he struck her the third time, she staggered four or five steps back to the north side of the road across from him, and he took two or three steps toward the car; then she heard a shot and the deceased was getting in the car; that one of the women said to her: "Now you have hurt him who is going to pay the doctor bill?" And she said: "Well, it is a cinch you will have to because I won't."

Joseph P. Cain testified that he lived across the road a quarter of a mile from where the defendant lives; that he saw a group of people picking up pecans by the side of the road that goes up to Mr. Hughes' house, and Mrs. Fowler was going down toward them; saw them get in the car and drive up towards the Hughes' house; saw Mrs. Fowler go up the road after them, and saw Mrs. Fowler step to one side when they were driving back; saw a man get out when the car stopped and go back and talk with Mrs. Fowler, and then come back and get into the car, and then get out again and go back, and he saw him hit Mrs. Fowler as much as three times.

Two or three witnesses were asked if they knew the general reputation of the defendant in the community as to being a quiet, peaceable, law-abiding citizen, or other-

wise, answered that they did, asked, "Is it good or bad," replied, "Good."

Two or three witnesses asked if they knew the general reputation of William Mushrush in the community in which he lived for being quarrelsome and turbulent or otherwise, answered they did, and that he had the reputation of being quarrelsome and turbulent.

The defendant, as a witness in his own behalf, testified that when he stepped out of the door he saw the people getting in the car and he followed his mother, saw his mother following the car; that when he got to the tree where he was standing when he fired the shot he looked up and saw Mushrush strike his mother three times; that Mushrush looked up and saw him and started toward his car and he shot him because he was afraid if he would get to the car he would have a gun or some kind of dangerous weapon and would hurt or kill his mother.

On cross-examination he stated that he did not remember what he said in the conversations had with the officers in the sheriff's office.

In rebuttal, the state introduced a statement made by the defendant following his arrest as follows:

"Well, I was laying there in bed and my sister 14 went out after a bucket of water and she seen these boys picking up pecans and she called mother outside and she hollered to me to get the gun and come on out there. I got up and slipped on my shoes and got the rifle and started out there just as fast as I could go. Before I got there they got in the car and drove up toward Hughes and mother went over by the road and tried to talk to them. They drove up to Hughes and stopped and honked and drove around in back and honked. When they saw her coming up the road they speeded up like they were going to hit her, she picked up a stick and throwed it but didn't

hit them. They stopped and a man got out and cussed her. He called her a damned son of a bitch and told her to go on back and tend to her business. Then he got back in the car and she tried to bawl him out and he shook his fist in her face. She said, I will get their license number and see what can be done about it. When she said that he got out and hit her four or five. I was fifty yards with the rifle when he saw me coming. At least I suppose he did. He didn't pay any attention to me and when he hit my mother I tried to level down with my left eye and couldn't and then he began to beg me after I moved over and shot him and wanted me to get him to a doctor. Said he was shot and shot bad. I came on up to the car as quick as I could and Mom got on the car and said she would go in there and see how bad he was hit. He started up and I stopped him and told him, Hell no, He wasn't going to take my mother in town. Then he began to holler for a doctor, said he was shot and shot bad. I told him to get the hell off and stay off. Before I shot him he was hollering and whooping and raising hell. He slapped my mother. I don't know whether he hit her or slapped her. He was starting back to the car when I shot him."

Numerous witnesses were called and testified to the good character of William Mushrush, the deceased, as to being a peacable and law-abiding citizen.

Several assignments of error relate to rulings of the court in the admission of alleged incompetent and prejudicial evidence on the part of the state.

A careful examination of the record leads to the conclusion that these alleged errors are without substantial merit. It also appears that no objections were made to the admission of the alleged incompetent evidence.

Error is assigned on the ground that the instructions given by the court do not state the law applicable to the case, in that the court failed to instruct the jury relative to the defendant's right to protect his and his mother's

property against unlawful invasion upon such premises by trespassers.

This contention on the part of the defendant is not supported by the evidence. the undisputed facts show that at the time of the shooting the deceased was not a trespasser. It is true that prior thereto he and his family were trespassers, gathering pecans, and when they saw the mother of the defendant coming they quickly returned to their automobile, and, from the time they did so return until the shooting occurred, they were not trespassers. They were on a private road owned by the oil company, having a lease on said premises, and constructed as a means of ingress and egress to Mr. Hughes' place from and, to the public highway, and when the fatal shot was fired they were returning to the public highway.

As was said in Schmitt v. State, 57 Okla. Cr. 102, 47 Pac. (2d) 199:

"A person may resist a trespass on his property, real or personal, not amounting to a felony or removal or destruction of property not feloniously attempted, by the use of any reasonable force, short of taking or endangering life; but, if he is unable to prevent it and there is no felony attempted, he must suffer the trespass and the loss of property and seek redress at the hands of the law, rather than commit homicide."

It is also contended that the court did not fully instruct upon the law applicable to the case.

It appears from the record that there was no request for instructions on the part of the defendant, and no exceptions were taken to the instructions given by the court.

One of the grounds of the motion for new trial is "That the instructions given by the court to the jury do not state the law applicable to the case," and it is urged

here that the court's instructions do not fully state the law of justifiable homicide in self-defense and in defense of a parent.

In this connection the court gave the following instructions:

"No. 4. You are instructed that homicide is justifiable when committed by any person in resisting any attempt to murder such person, or to commit any felony upon him, or when committed in the lawful defense of such person, or of his parent, when there is a reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and imminent danger of such design being accomplished.

"No. 5. You are instructed that as one of his defenses the defendant claims that the killing was justifiable on the ground of self-defense, and in defense of his mother.

"In this connection you are instructed that the law gives to every person the right to fight in his self defense or in defense of his parent, to protect himself or his parent from the unlawful attack of his adversary, and if necessary to save his life, or the life of his parent, or to prevent great bodily injury being done to him or his parent, he may take the life of his assailant or his parent's assailant.

"No. 6. A person need not be in actual imminent peril of his life being taken, or a great personal injury being done to him; all that is required is that the defendant had reasonable ground to believe, and did believe, from the facts as they reasonably appeared to him at the time, that the danger was so urgent or pressing, or apparently so urgent and pressing, that the defendant could not avoid the necessity of killing in safety to himself, to protect himself from death or great personal injury, and if under such circumstances the killing took place, it was justifiable.

"In determining the question as to whether or not the defendant was in danger or apparent danger, under these instructions, you are told that the law requires you

to view the circumstances at the time from the defendant's standpoint, as they reasonably appeared to him.

"No. 7. You are instructed that what act upon the part of the person slain would justify a person taking his life varies with the circumstances of each particular case. Under some circumstances the slightest movement may justify instant action on the part of the person threatened with danger, upon the ground of reasonable apprehension of danger. Under other circumstances this might not be true, and it is for the jury, viewing the facts and circumstances in evidence from the defendant's standpoint, to determine how this may be in each case.

"No. 9. You are instructed that if you find from the evidence or entertain a reasonable doubt of the fact, that at the time the defendant fired the fatal shot the deceased was making a demonstration which reasonably indicated to the defendant, viewed from his standpoint at the time, that the deceased was about to kill or inflict serious bodily injury upon the defendant, and the defendant at the time he fired the shot reasonably believed that he was in danger of losing his life or of receiving great bodily injury at the hands of the deceased, and if under those circumstances he fired the fatal shot, he would be justifiable, and your verdict should be not guilty."

"No. 12. You are instructed that while the law permits a person to defend himself against real or apparent danger, such right is defensive and not offensive, and does not mean or imply the right of attack, nor will it permit of acts done in retaliation or for revenge.

"If you find and believe from the evidence, beyond a reasonable doubt, that the defendant's mother, by her acts in causing the deceased to stop his car, was the aggressor and brought on the affray between her and the deceased, then and under those circumstances she would not have been entitled to claim that her acts were done in self-defense. The defendant had no greater right to defend his mother than she would have had to defend herself under the same circumstances. Therefore, if she was the aggress-

or and brought on the difficulty between her and the deceased, then and under those circumstances the defendant did not have the right to shoot the deceased in defense of his mother, even though he may not have known how the affray started or who was responsible for it.

"In this connection you are further instructed that even if the defendant's mother did provoke the difficulty, yet if thereafter she abandoned the difficulty, and made that fact known to the deceased, and thereafter the deceased attacked her, then in that event the deceased would be the aggressor and the mother would have the right to defend herself, and likewise the son would have the same right to defend his mother that she would have."

The criticisms of the foregoing instructions are based on the theory that the defendant had a right to intervene regardless as to whether or not his mother was the aggressor.

In the case of Moore v. State, 25 Okla. Cr. 151, 219 Pac. 175, this court held:

"The right of one to defend another is coextensive with the right of the other to defend himself, and one who intervenes in a difficulty between others must accept all the responsibilities and liabilities of the person for whom he intervenes." Syl. 3.

And further held:

"If one fires a fatal shot in defense of his son, he is justifiable or not according as the son would be innocent or guilty had he fired the shot in his own defense." Syl. 4.

It may be said that this rule may in exceptional cases work hardship; however, the opposite rule would allow an innocent man who had been forced to strike in self-defense to be killed with impunity merely because appearances happened to be against him at the moment a relative of his antagonist reached the scene of conflict. We deem

it our duty to enforce rather than to relax the rule, which admits of no justification for taking human life except necessity.

It follows that the criticism of the instructions on the ground that they do no fully state the law of justification in self-defense and in defense of parent is without merit.

We have examined the other assignments of error and find none of them have sufficient merit to warrant any further discussion.

After a careful examination of the entire record, we fail to discover anything whereof the defendant has just right to complain. We think the evidence in the case was amply sufficient to support a verdict for murder. Fortunately for the defendant, the jury in mercy or in a mistaken view of the facts, found him guilty of manslaughter in the first degree. This the jury had a right to do. The judgment of the trial court is affirmed.

EDWARDS, P. J., and DAVENPORT, J., concur.