## J. A. MOORE v. STATE.

No. A-4218. Opinion Filed Oct. 30, 1923.
(219 Pac. 175.)

(Syllabus.)

1. **Homicide—Rule as to Admissibility of Dying Declaration.** Dying declarations, to be admissible, must be made under a sense of impending death, but it is not necessary that the declarant state that he is expecting immediate death. It is sufficient if, from all the circumstances, it satisfactorily appears that they were made under that sanction.

2. **Same—Statements of Deceased Immediately after Homicide Held Sufficient Predicate.** Proof that deceased was shot about 3 o'clock in the afternoon, and died that night, that his wounds were necessarily fatal, and that he stated to those present immediately after he was shot, "I am going to die," and that "I would rather die at home than anywhere else," sufficiently shows that the deceased appreciated the certainty of his impending death, and is in itself a sufficient predicate for the admission of his statement of the circumstances of the homicide as a dying declaration.

3. **Homicide—Intervener in Difficulty Between Others—Criminal Responsibility.** The right of one to defend another is coextensive with the right of the other to defend himself, and one who intervenes in a difficulty between others must accept all the responsibilities and liabilities of the person for whom he intervenes.

4. **Same—Killing Another in Defense of Son.** If one fires a fatal shot in defense of his son, he is justifiable or not according as the son would be innocent or guilty had he fired the shot in his own defense.

5. **Homicide—Manslaughter in First Degree—Evidence Sustaining Conviction.** In a homicide case, evidence reviewed, and held to justify a conviction of manslaughter in the first degree.

Appeal from District Court, Le Flore County; E. F. Lester, Judge.

J. A. Moore was convicted of manslaughter in the first degree, and he appeals. Affirmed.

Neal & Neal and White & Reid, for plaintiff in error.

George F. Short, Atty. Gen., and Baxter Taylor, Asst. Atty. Gen., for the State.

DOYLE, J. In the information in this case, filed in the district court of Le Flore county, the defendant, J. A. Moore, was charged with the crime of murder, he having shot and killed one J. T. Bailey. Upon his trial the jury found him guilty of manslaughter in the first degree, and assessed the punishment at imprisonment in the penitentiary for the term of 15 years. From the judgment rendered in pursuance of the verdict, he has appealed to this court.

It appears that the homicide occurred at the annual school meeting held in a schoolhouse near Zoe, on the 12th day of July, 1921; that about 150 people were present, and the meeting had been in progress for about one hour at the time of the tragedy. The evidence shows that there was considerable feeling among the patrons of the school relative to the employment of the principal of the school, and that the school board had already employed Mr. McAnally principal for the ensuing year, and some of those present, including the deceased, favored reducing the term of school to 3 months, instead of 9, on account of this feeling towards Mr. McAnally.

Mr. Whitener testified:

"There must have been 150 or 200 people present. I was alone in the hallway. Mr. Bailey came out the door, and the defendant's son came up behind him, and struck at Mr. Bailey. They clinched, and went down on the floor. Then the defendant rushed down the hallway to them with something in his right hand. The crowd rushed out between me and the defendant, and I heard but did not see the shooting."

D. A. Carriker testified:

"They were discussing the length of the term, whether

it should be 9 months or a shorter term. Mrs. Hendrix got up, and said she was in favor of 9 months school, and spoke highly in favor of Mr. McAnally. Mr. Bailey spoke up, and said that was the first person he had ever heard speak of Mr. McAnally as being a good teacher. The defendant jumped up and said something in regard to a man arguing with a lady. Mr. Bailey told him that he would argue with him on the outside, the defendant said, 'All right,' and they started out. Mr. Bailey walked out the east door, and the defendant walked down the aisle to the west door. Both doors lead into the same hall. The defendant's son, Henry Moore, was sitting on the back of a seat near the west door, and as Mr. Bailey started out Henry started going out ahead of his father. I followed the defendant into the hall. Henry Moore had his arm around Mr. Bailey's neck, and the defendant commenced shooting him in the back. There was six or seven shots fired—maybe more. The first three or four shots were in rapid succession. There was a short lull, then the other shots. It seems to me now that four shots hit Mr. Bailey in the back.''

Wilson McKenny testified:

''I was standing in the east door when the words were spoken. They both started out. Mr. Bailey came to the door I was standing in and passed out by me. The defendant started out the west door. I turned to the hallway, and saw Henry Moore either strike at or grab Mr. Bailey, I don't know which. They both went to the floor in the scuffle. I saw the defendant I judge 8 or 10 feet down the hallway. Mr. Bailey was down on his knees. The defendant held the gun close, and shot Mr. Bailey in the back. I could not say just how many shots were fired. The pistol was a Colts automatic .32. The east and west doors are about 15 feet apart.''

Will McKenney testified:

''I ran out the west door. Henry Moore was standing by the east door, and he struck or grabbed Mr. Bailey as he came out the door. They went down, and the defendant rushed up and shot Mr. Bailey in the back. It appears that

death ensued within 12 hours from the time of the shooting, the result of four gunshot wounds in the back and one in the side.''

The defense was justifiable homicide.

Henry Moore, 18 years of age, son of the defendant, testified:

''I left the room, and was out about 10 or 15 minutes, and as I was coming back through the hall Mr. Bailey rushed out, and I threw up my hands to avoid colliding with him; then he hit me with his left fist, and knocked me down. I started to get up, and he caught me around the neck. I heard the shots, and some one pulled me back. Mr. McAnally, the teacher, is my brother-in-law.''

Mrs. Terry testified:

That her father, J. T. Pope, was chairman of the meeting. That she was standing outside at an open window. That when Mr. Bailey enterrupted Mrs. Hendrix the defendant said, ''Mr. Chairman, I think these proceedings are out of order; here is a gentleman disputing with a lady.'' Mr. Bailey said, ''Come outside and I will argue with you.'' The defendant started out, and his wife said, ''Oh, Jim, don't fight, Jim!'' and Mrs. Bailey said, ''Yes; they will.'' The defendant went in a hurry, and Mrs. Moore followed Bailey out.

O. C. Terry testified:

That he went out the east door of the room, and the second or third shot was fired as he entered the hall. Mr. Bailey had his left arm around Henry Moore's neck, and had his right hand in his pocket.

W. O. Pace testified:

''When I got into the hall Mr. Bailey had Henry Moore down. The defendant was about halfway down the hall, and his wife said, 'Oh, Jim, he is killing Henry!' ''

B. T. McAnally testified:

That he was a son-in-law of the defendant, and the principal of the school. That when Mr. Bailey started out of the room the defendant's wife said, "Jim, don't fight!" and the defendant sat down. His wife started for the door, and the defendant got up and started for the door also, and witness followed two or three steps behind the defendant. When they reached the hall Mrs. Moore hollered, "Jim, he is killing Henry!" Mr. Bailey had his arm around the boy's neck, and had his right hand in his pocket, and the defendant ran up and shot him, firing five or six shots.

Mrs. James Moore, wife of the defendant, testified:

That when Mr. Bailey invited her husband to come out "that scared me. I jumped up and hollered, 'No, Jim, you must not fight!' and Jim kindly smiled, and sat down. I turned and saw Mr. Bailey knock my boy down, and I ran out and grabbed Mr. Bailey by the hair, and went to pulling, and he hit me, and shoved me back against the wall, and rammed his hand back. I hollered to my husband, 'Oh, Jim, he is killing Henry!' and he ran up and began to shoot."

As a witness in his own behalf the defendant testified:

"I addressed the chairman and told him I thought Mr. Bailey was out of order arguing with a lady. Mr. Bailey told me to come outside, and he would argue it with me. When he started out the door he said something else, and I turned around, and I saw him hit that boy of mine, and he went down, they both fell just outside the door. I went out, and I found him there in that position. My wife hollered at me, and said, 'He is killing him!' I went right on up and shot him. I shot him because I thought my boy was in danger."

Several witnesses testified that the defendant's reputation as a peaceable, law-abiding citizen was good.

In rebuttal Roy Branson testified that Henry Moore was in the room when Mr. Bailey invited the defendant out, and immediately went into the hall.

Several witnesses testified that previous to the school meeting they heard the defendant say: "If old man Bailey tries to run that school meeting, that will be his last one."

The testimony is voluminous, covering several hundred pages, but the foregoing statement is sufficient for the purpose of this opinion. Several assignments of error relate to the rulings of the court in the admission of alleged improper evidence on the part of the state.

A careful examination of the record leads to the conclusion that these alleged errors are technical, and without substantial merit. For instance, it is contended that the court erred in admitting the testimony of Mrs. Jackson Turner as to statements of the deceased made after he was shot. She testified that shortly after he was shot he said: "Get back and be quiet; I am going to die"—and some one mentioned taking him to the hospital, and he said: "No; I would rather die at home than anywhere else." She further testified that the deceased several times stated that as he started out the door Henry Moore hit him with knucks, and knocked him almost down, and as he was trying to tear loose from Henry the defendant shot him. By numerous decisions of this court it is held that it is sufficient if it satisfactorily appears that the declarations were made under a sense of impending death, whether it be directly proved by the express language of the declarant or be inferred from his evident danger, or the opinions of medical attendance stated to him, or from other circumstances of the case, such as the length of time elapsing between the making of the declarations and his death. Poling v. State, 12 Okla. Cr. 27, 151 Pac. 895, Ann. Cas. 1923E, 663; Palmer v. State, 17 Okla. Cr. 220, 187 Pac. 502; Williams v. State, 17 Okla. Cr. 375, 188 Pac. 890; Morris v. State, 6 Okla. Cr. 29, 115 Pac. 1030. We are clearly of the opinion that the statement made by deceased was prop-

erly admitted in evidence as a dying declaration.

Error is assigned in the giving and in refusing to give certain instructions.

It is contended that the court improperly instructed the jury on the law of justifiable homicide committed by a parent in defense of his child. Our Penal Code provides that homicide is justifiable (paragraph 2, § 1754, Comp. Stats. 1921):

"When committed in the lawful defense of such person, or of his or her husband, wife, parent, child, master, mistress, or servant, when there is a reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and imminent danger of such design being accomplished."

In lieu of the instructions requested, the court gave the following:

"(9) Homicide is justifiable when committed in the lawful defense of one's person, or of the person of some member of his immediate family."

"(13) You are instructed that a person under the laws of the state of Oklahoma has a right to defend his child against the unlawful assault of another to the same extent that he might defend himself under similar circumstances. But such person has no right to go further in the defense of his child than he may lawfully act in the defense of his own person."

"(16) You are instructed that a person in defending himself or his child has no right under the law to use more force than appears to him, viewing the controversy from his standpoint and as he is then and there situated, to be reasonably necessary to protect himself or his child against the unlawful assaults of another, and, if such person in the controversy or combat uses more force than appears to him to be reasonably necessary, viewing the controversy from his

standpoint, and as he is then and there situated, to protect himself or his child from the unlawful assault of another, and as a result thereof a homicide is committed, the killing would be unlawful, the degree of crime depending upon whether or not the act resulting in death was done with a premeditated design to effect the death of the person killed.''

''(18)   A parent has the right under the law to go to the assistance of his son where the son is suffering an unlawful attack from another, and to use such force, even to taking life, as is necessary or apparently necessary under all the facts and circumstances as they then reasonably appeared to him to prevent the taking of his son's life or the infliction upon his child of great bodily injury.''

''(19) If the deceased made an assault   upon   Henry Moore, son of the defendant, defendant had the absolute right under the law to go to the assistance of his son, and, if upon the arrival of the defendant at the place of the conflict between the deceased and his son he discovered that the son was receiving or about to receive great personal injury at the hands of the deceased, then he had the right to use force to prevent the infliction of great personal injury upon his son, even to the taking of life, if it was necessary or apparently necessary to do so, to prevent the infliction of great personal injury upon the son of the deceased.''

''(20) A father has a right to fight in the necessary defense of his own son, and the fact that he attacked one who is in combat with his son will not constitute such father as an aggressor in such combat, as that word is used in these instructions, unless the son willfully, and without real or apparent necessity, entered into a difficulty for the purpose and with the intent upon the part of the son to take the life of his adversary or to do him great bodily harm.

''(21) You are instructed that, if you believe from the evidence, or have a reasonable doubt thereof, that the deceased challenged the defendant or invited him out, and that the deceased thereupon left the schoolroom and began an attack upon the son of the defendant, and that the defendant thereupon left the room for the purpose of defend-

ing his son against the attacks of the deceased, if any, and that the defendant, situated as he was, and from his standpoint, as a reasonable person, believed at the time that he fired the shots at the deceased that it was reasonably necessary to save his son from great bodily injury or from death, then you will resolve such doubt in favor of the defendant and acquit him.''

''(22) You are instructed that, if the son of the defendant was assaulted in such a way as to induce in the defendant a reasonable belief that his son was in danger of losing his life or suffering great bodily harm at the hands of the deceased, the defendant would be justified in attacking the adversary of his son, although the danger was not real but only apparent. The defendant would not be responsible criminally if he acts in the defense of his son from real and honest convictions as to the character of the danger induced by reasonable appearances, although he may be mistaken as to the extent of the actual danger. The son of the defendant need not have been in actual imminent peril of his life or of receiving great bodily harm before the father would have been justified in slaying the deceased. It is sufficient if in good faith the father had reason to believe from all the facts and circumstances as they appeared to him at the time that his son was in such imminent peril.''

''(23) You are instructed that, in determining whether or not the defendant, as a reasonable man, in good faith believed at the time of the killing that his son was in danger of suffering death or serious bodily injury at the hands of the deceased, you should take into consideration all the facts and circumstances that transpired prior to and at the time of the killing.''

''(24) You are instructed that you must view the evidence in this case upon the question of danger or apparent danger to the son of the defendant at the time of the killing from the viewpoint of the defendant, and as it then reasonably appeared to him.''

''(25) You are instructed that, if the evidence is such as to raise in your minds a reasonable doubt as to whether

or not the defendant at the time of the homicide acted in good faith upon reasonable appearance of danger of his son receiving great bodily harm or death at the hands of the defendant, then you must resolve that doubt in favor of the deceased, and acquit him, unless you further believe from the evidence beyond a reasonable doubt that the son of the defendant voluntarily entered into the difficulty, within the meaning of that term as hereinbefore defined.''

The instructions requested were based on the theory that the father had a right to intervene regardless as to whether or not his son was the aggressor.

As a general rule a person has a right to use violence in defense of another only when the imperiled person would have been justified in using it in his own defense. Both must have been free from fault in bringing on the difficulty.

In Wharton on Homicide (3d Ed.) § 332, it is said:

''The doctrine of freedom from fault in bringing on a difficulty as a condition precedent to a plea of self-defense applies with equal force to a case in which one person interferes in a difficulty between two others in behalf of, or to protect, one of them; and generally speaking a person who does this will not be allowed the benefit of the plea of self-defense, unless such plea would have been available to the person whose part he took in case he himself had done the killing, since the person interfering is affected by the principle that the party bringing on the difficulty cannot take advantage of his own wrong. If the person sought to be protected provoked or brought on the difficulty, he must have clearly manifested a desire and intention to retire from the conflict; and, even then the person interfering would not be justifiable if he struck the fatal blow in pursuance of a previous design to assist his friend in the event of a personal difficulty. And where one person interferes in behalf of another who was the aggressor, and there is opportunity to retreat after the interference, and advantage is not taken of it, the person interfering can claim no greater

right than the other, and neither of them can invoke the doctrine of self-defense. Thus, if a son fight in defense of his father, his act in doing so will receive the same construction as that of the father, and, if the latter was the aggressor in bringing on the difficulty, and could not plead self-defense, the same rule applies to the son. And the son cannot rely upon his own freedom from fault in bringing on the difficulty as a defense, where he knew the father had provoked the attack; both must have been without fault in bringing it on. Nor is a father justified in killing the adversary of his son, where the son had provoked and brought on the conflict in which he was placed in imminent danger. And the plea of self-defense cannot be interposed by a father who kills an officer rightfully seeking to arrest his son, to prevent such arrest. Nor can one strike to relieve a brother from peril unless the brother was free from fault in bringing on the difficulty which placed him in peril. And if a person in whose defense a brother engaged was in fault, and had not retreated or attempted to retreat, the interference is not justifiable or excusable.''

In Utterback v. Commonwealth, 105 Ky. 723, 49 S. W. 479, 88 Am. St. Rep. 328, it was held that a father who shot in defense of his son was excusable or not according as the son would have been innocent or guilty had he fired the shot in his own defense.

In Wood v. State, 128 Ala. 27, 29 South. 557, 86 Am. St. Rep. 71, it was held that one who interferes in a pending difficulty in behalf of a brother and takes the life of the other combatant stands in the shoes of the brother in respect of fault in bringing on the difficulty, and he cannot defend upon the ground that his brother was in imminent and deadly peril, and could not retreat, unless the latter could have defended upon that ground had he killed his assailant. It was also held to be of no consequence that the defendant, when he interfered, was not aware of any fault on the part of his brother in bringing on the difficulty.

It may be said that this rule may in exceptional cases work hardship; however, the opposite rule would allow an innocent man who had been forced to strike in self-defense to be killed with impunity merely because appearances happened to be against him at the moment a relative of his antagonist reached the scene of conflict. We deem it our duty to enforce rather than to relax the rule, which admits of no justification for taking human life except necessity.

Upon careful consideration our conclusion is that the instructions given by the court fully covered every possible phase of the case presented by the testimony.

This disposes of the questions raised in the case.

On the defendant's own testimony the killing cannot be justified under the law, and on the undisputed testimony there was no real or apparent necessity for this homicide. It follows that the defendant was guilty at least of manslaughter in the first degree.

The judgment is accordingly affirmed.

MATSON, P. J., and BESSEY, J., concur.