Commonwealth *v.* Vassar, Appellant.

552

Argued April 21, 1952. Before DREW, C. J., STERN, STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

*Fred B. Trescher,* with him *P. K. Jones* and *Kunkle & Trescher,* for appellant.

*Joseph M. Loughran,* Assistant District Attorney, with him *L. Alexander Sculco,* District Attorney, for appellee.

OPINION BY MR. JUSTICE MUSMANNO, May 26, 1952:
On January 13, 1951, Beatrice Vassar, 55 years of age, shot and killed her husband, 71 years of age, in

New Kensington, Westmoreland County. She was indicted, tried, and convicted of murder in the first degree; and sentenced under the finding of the jury, to life imprisonment. Her motion in the lower Court for a new trial was refused and an appeal has been taken to this Court.

A new trial could possibly bring to the defendant ill omen because, on the evidence presented by the Commonwealth and defense itself, another jury could quite reasonably return a first degree murder verdict with the *death penalty* attached. Although a horrible crime has been committed and the defendant now faces the dismal fate of freedomless days for all the years yet remaining to her, we can appreciate, in behalf of the respect for human life, the urging of the able district attorney of Westmoreland County, joined in by the assistant district attorney who capably tried the case, that the judgment of the lower court be affirmed, for in the event of another trial: ". . . there is a great possibility that under the uncontradicted facts of this case, another jury might recommend the death penalty for Beatrice Vassar."

However, regardless of possibilities, the case is before us for a full review on all features involved and will be so considered.

The record covers a story as sordid as any coming out of an Algerian Kasbah, but revulsion at its gross details will not lessen in any way the guarantee of a fair trial which is the defendant's right under the Constitution and the laws of our Nation and Commonwealth.

Beatrice Vassar was only 16 years of age when she began her career in harlotry, assisted by the man she was later to marry and to slay. Married in Jacksonville, Florida, they travelled into various cities and states and finally took up permanent residence in New

Kensington, Pennsylvania. Partners in shame, the husband Newton Vassar acter as procurer in their abased trade. With side excursions also into gambling and other vice, punctuated by occasional incarceration for their transgression of law, Mr. and Mrs. Vassar, eventually, now advanced in life, settled down with a house of their own, to carry on as proprietors in the business of sin. They employed three women to cater to their customers, and this profligate trio was present on January 13, 1951, when the partnership was liquidated by the shooting, of which the defendant now stands convicted.

Owing to the peculiarities of the enterprise which kept the occupants of the house occupied most of the night, the Vassar establishment did not ordinarily begin the day's activities until afternoon. On this particular day the defendant got up at about noontime, attended to some household functions and then aroused her workers at 4:30 p.m. for trade which had arrived. Her husband, who had somewhere acquired the sobriquet of "Ten Nights," had adjusted himself in a large easy chair in the living room, stretched out his feet on a hassock and prepared to pass away the time playing solitaire. The defendant, after serving supper to the trio of inmates, picked up in the kitchen a 32 calibre Colt revolver, which she had deposited there earlier, and advanced with it through the dining room. The girls leaped up from the table and scurried for safety. Witness Sheppard testified that one of the girls remonstrated with the defendant: "What are you going to do? Don't do that." Witness Harris testified she said to the defendant: "Oh, Miss Bee, what are you going to do with that gun?" The defendant's only reply was: "I'm tired." Then passing through the dining room to the living room she pointed the weapon at her husband and pulled the trigger four times, each bullet finding

its mark. The only exclamation heard from the decedent was: "Oh, my Lord."

When the police arrived, they found the dead body of Newton Vassar still in the easy chair, one foot still on the footstool and the cards still in the position of the game, except those which had fallen to the floor as the player's arms fell lifelessly to his sides.

These facts spell out first degree murder according to the standard of any criminal code, and specifically under our murder statute and decisions.

The defendant pleaded self-defense and she testified: "A. Well, I went in the kitchen, and they sat down to eat, so I had taken the gun out of the drawer to carry it back upstairs, and when I come through there, I got in, started in the door, see, he started towards me, and when he started towards me, I thought he was going to take the gun away from me, and I just pulled the trigger. Q. Do you know how many times you pulled the trigger? A. I couldn't say, three or four times. Q. Where were you, as nearly as you can tell us, when you pulled the trigger? A. Oh, I think I was about that far inside the door, out from here over there. Q. That would be about two and three feet inside the living room door? A. The living room door. Q. Then you— and where was he, I'll ask you. A. He was over right straight in front of me, right over in that big chair, but he got up when he started toward me, see, when he started I thought he was going to take the gun away from me, he shot me once before, and I thought he was going to take the gun and shoot me, and I just pulled the trigger."

She also testified that the decedent lunged toward her, with the remark: "Bitch, you're drunk. I'll kill you in here." But no one of the persons present corroborated her in this statement. All of the witnesses testified that there was no argument, no exchange of

words between the defendant and decedent, and no movement on the part of the decedent. The position of the decedent's body, which admittedly no one touched before the arrival of the police, categorically refutes the defendant's assertion of any aggressiveness on the part of Newton Vassar.

The defendant testified at length to the shortcomings of her dead husband: he took the profits of the trade, he was shiftless, he argued with her, he beat her, once he stabbed her and another time he shot her (thirty years before) and this wound had disabled her arm. Although the decedent was a small, frail man and the defendant a fairly large person, it is not difficult to assume that the decedent was as lacking in physical restraint as he was wanting in moral discipline. However, no previous victimization justifies the taking of human life.

Police Officer Buckner testified that when he arrested the defendant she said: "I shot him. He's in there. I was tired of it all. I was tired of him nagging at me."

This was unquestionably the whole purpose of the evil deed. She was tired of her aged husband and wished to be rid of him. She was also tired of the business in which they were engaged and assumed that in some way the elimination of the man with whom she had started down the path to Sodom and Gomorrah would transport her to some undefined happier state. It was not until after the killing that she realized she had made matters infinitely worse, and, in preparation for the trial, she wove from the loom of mendacity the story of self defense. But it was inevitable that the story would hold together no better than the decayed threads of which it was composed. In the courtroom it completely disintegrated. Not a single thread was left unbroken.

The revolver employed in the killing had originally been kept on the second floor of the house, but, according to the defendant the decedent brought it down to the first floor and placed it in the piano stool in the living room to have it available when the owner, who had pawned it with the Vassars, should return to redeem it. The defendant said further that she removed it from the piano stool for fear her husband might use it. This explanation is utterly devoid of credibility because, had Newton Vassar intended to adopt the weapon against her, he could have done so at any time during the period that he physically possessed it. The obvious truth is that she took the revolver from the living room into the kitchen so that she could fire it without incurring the risk of his seeing what she was about to do, thus offering him a chance of escape, which was a definite possibility if she had to take it out of the stool in his immediate presence.

Beatrice Vassar's actions fall squarely within the statute which defines first degree murder as that "murder which shall be perpetrated by . . . any other kind of wilful, deliberate and premeditated killing. . ." (Act of June 24, 1939, P.L. 872, sec. 701, 18 P.S. 4701.)

Defendant's counsel at the oral presentation before this Court conceded that the Commonwealth's case of first degree murder was amply established, but he argued that a new trial was indicated because of alleged errors or omission in the Trial Judge's charge. He maintained that "at no point in the Court's charge is the jury told what constitutes self-defense." It is sufficient in this regard to quote from the Court's charge wherein the Court said: "If the circumstances are both adequate to raise and sufficient to justify a belief in the necessity to take life in order to save one's self from such danger, where the belief exists and is

acted upon, the homicide is excusable upon the theory of self-defense. . ."

"The right to stand in self-defense without fleeing has been strongly asserted by the defense. It is certainly true that every citizen may rightfully traverse the street, or may stand in all proper places, and need not flee from every one who chooses to assail him. Without this freedom our liberties would be worthless."

But aside from these instructions on the law of self-defense the Court dwelt at great length on the defendant's contentions of self-defense as reflected in her testimony. The Court's charge in the printed record covered 28 pages. The Trial Judge devoted 5 full pages to the defendant's testimony, rehearsing in detail her whole story as given from the witness stand and repeating a number of times the defendant's assertion that the decedent was the aggressor; that he advanced on her, and that since he had shot her on a previous occasion she feared he would take the gun away from her. The Judge also reminded the jury of the testimony of a witness who said he had heard the decedent two or three days before Christmas threaten to kill the defendant unless she "shut up."

If the jury had believed the defendant's narrative as to how the killing occurred, they could have returned no verdict other than Not Guilty, because, under the law as the Judge imparted it to them, the defendant's facts spelled acquittal. But the jury did not believe the defendant, and, acting as reasonable, conscientious citizens they could not believe a tale whose acceptance required the credulity of a Boeotian and the blind faith of a kindergarten child.

Defendant's counsel criticized the Trial Judge's charge on three other points, namely, (1) that he failed to define the type of manslaughter which results when

a blow is struck or a shot fired in the belief that one's life is in danger but the belief is not well founded; (2) that he erred in instructing the jury that the defendant was obliged to retreat to the wall; (3) that he erred in instructing the jury it was unnecessary to find an intent to take human life in order to convict of murder in the first degree.

Every one of the points mentioned by defense counsel was covered ably and well by the learned Trial Judge. The Judge's stressing of reasonable doubt and his instructions on how the jury could return a verdict of not guilty opened wide the door for the jury to allow the defendant to pass through to freedom. But the jury was compelled to close that door because of what the defendant did, and not what the Judge declared or did not declare.

A great deal of the Judge's charge was patterned after instructions approved in the classic case of *Commonwealth v. Drum*, 58 Pa. 9, and the cases of *Commonwealth v. Principatti*, 260 Pa. 587, 104 A. 53, and *Commonwealth v. Nelson*, 294 Pa. 544, 144 A. 542.

The lower court properly ruled out involuntary manslaughter and correctly stated the law on self-defense (which would work an absolute acquittal of the defendant) and on voluntary manslaughter: "Now, I have told you that the defense in this case is that this is an excusable homicide, and that the killing was in self defense. The dividing line between the self-defense and this character of manslaughter (voluntary, brought about through the influence of a passion of fear) seems to be the existence, as the moving force, of a reasonably founded belief of either imminent peril to life or great bodily harm, as distinguished from the influence of an uncontrollable fear or terror, conceivable as existing but not reasonably justified by the immediate circumstances. If the circumstances are both adequate

to raise and sufficient to justify a belief in the necessity to take life in order to save one's self from such danger, where the belief exists and is acted upon, the homicide is excusable upon the theory of self-defense; while if the act is committed under the influence of an uncontrollable fear of either death or great bodily harm, caused by the circumstances, but without the presence of all the ingredients necessary to excuse the act on the ground of self-defense, the killing is manslaughter."

In considering whether the defendant should have attempted to retreat before firing, defendant's counsel argued that one must keep in mind the "decedent's superior strength and agility, and the defendant's crippled condition." There is no evidence in the record that the decedent possessed superior strength and agility. The realities were quite the reverse. The decedent was 71 years of age, weighed only 118 pounds, was tubercular and, when the defendant appeared with the revolver, was in a semi-recumbent position. The defendant, on the contrary was 16 years his junior, weighed 150 pounds and apparently in normally good health. Although the defendant testified that she had difficulty in lifting her left arm because of a wound inflicted on her by the decedent years ago, there was no evidence to substantiate the statement that she was "crippled," in the sense that that word is ordinarily used.

With regard to escape, the defendant could easily have left the house, if she feared for her life, as her three workers fled when they saw her with the deadly firearm. The defendant never explained why she approached the decedent with the weapon in her hand. She said that she was taking the gun back upstairs, but, as the plan printed in appellee's brief shows, there was no need to approach the decedent in the living room in order to reach the stairs conducting to the second floor room. And, since she testified she had previously

carried the revolver in her pocket, there was no need for her to carry it exposed this time. Of course, it is obvious that she carried it exposed because she intended to use it.

The Trial Judge also correctly instructed the jury on the law regarding intent when he said: "The proof of the intention to kill, and of the disposition of mind constituting murder in the first degree, under the Act of Assembly, lies on the Commonwealth. But this proof need not be express or positive. It may be inferred from the circumstances. If, from all the facts attending the killing, the jury can fully, reasonably, and satisfactorily infer the existence of the intention to kill, and the malice of heart with which it was done, they will be warranted in so doing. He who uses upon the body of another, at some vital part, with a manifest intention to use it upon him, a deadly weapon, as an axe, a gun, a knife or a pistol, must, in the absence of qualifying facts, be presumed to know that his blow is likely to kill; and, knowing this, must be presumed to intend the death which is the probable and ordinary consequence of such an act. . . ." This statement of the law has been approved in numerous decisions of this court: *Commonwealth v. Steele,* 362 Pa. 427, 66 A. 2d 825; *Commonwealth v. Pasco,* 332 Pa. 439, 2 A. 2d 736; *Commonwealth v. Weston,* 297 Pa. 382, 147 A. 79; *Commonwealth v. Drum,* 58 Pa. 9.

Only one other matter remains to be considered. Because of the decision of the Superior Court in *Commonwealth ex rel. Holly v. Ashe,* 166 Superior Ct. 599, 74 A. 2d 182, the Court below and the District Attorney were of the belief that sentence had to be imposed during the term of the Court in which the defendant was convicted. Accordingly, while the motion for new trial was pending, the Trial Judge imposed sentence. However, as noted in the decision of this Court in that

same case, 368 Pa. 211, 219, 82 A. 2d 244, "there is neither statute nor rule requiring that a court impose sentence during the term in which a defendant is convicted."

The record in this case, as it now stands, shows that sentence was imposed while motion for a new trial was pending in the lower Court. So as to avoid any question in the future as to the legality of the defendant's imprisonment, without specifying that the previous sentence was ineffective, it is hereby ordered that the lower Court recall the defendant for re-imposition of sentence in accordance with this opinion.

Judgment affirmed.