Commonwealth *v.* Daniels, Appellant.

164

Submitted April 21, 1972. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*Albert Bartolomeo,* for appellant.

*Romer Holleran* and *Milton M. Stein,* Assistant District Attorneys, *James D. Crawford,* Deputy District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, March 16, 1973:

Joseph Daniels, the appellant, was convicted in a nonjury trial of two charges of voluntary manslaughter. Post-trial motions were denied and prison sentences of one and one-half to seven years, to run consecutively, were imposed on each conviction. These appeals followed.

The prosecution stemmed from the stabbing of Perry Kellam and Dempsey Williams shortly before midnight on January 23, 1971, in the hallway of an apartment house in which Daniels resided in Philadelphia. After the occurrence Daniels went outside, flagged down a passing police vehicle, led the police to where Kellam and Wilson both lay prostrate, admitted he stabbed them and produced the knife he used in the attack. Upon being taken to a hospital, Kellam was immediately pronounced dead. Wilson died from his wounds on February 4th.

Daniels asserts two assignments of error. He urges the trial evidence fails to support the convictions, and hence, the trial court erred in not sustaining a motion to arrest the judgments, or, even if the contrary is true, a new trial should have been awarded because of the evidentiary use at trial of a recorded incriminating statement he made to the police in the absence of a knowing and intelligent waiver of his constitutional rights. We shall discuss the last mentioned assignment of error first.

A pretrial motion to suppress the challenged statement was denied after an evidentiary hearing. The uncontradicted testimony of the Commonwealth at this hearing[1] may be summarized as follows:

On February 8, 1971, about 8:15 a.m., Daniels was informed by a police detective that both Kellam and

---

[1] As to our scope of review of a suppression hearing, see *Commonwealth ex rel. Butler v. Rundle*, 429 Pa. 141, 239 A. 2d 426 (1968).

Wilson were dead; he was then warned of his rights in accordance with the mandate of *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602 (1966), and asked if he wished to make a statement; Daniels responsively indicated he understood what he was told and said he was willing to make a statement without the assistance of counsel; he then proceeded to give his version of the stabbing occurrence which was recorded on both a typewriter and a tape recorder; during the interview Daniels was alert and responsive, but said he dropped out of school in the fourth grade and could not read or write; after the typewritten statement was completed, it was read verbatim to Daniels who then signed his name on each of its seven pages.

Daniels did not testify at the suppression hearing,[2] but his counsel introduced a Psychiatric Evaluation Summary prepared by the Psychiatric Division of the court's Probation Department. This report stated, in part, that Daniels appeared to have "some schizoid qualities" and "has an I.Q. [73] functioning in the defective mild range of intelligence." This Evaluation Summary also stated the following:

"With regard to his [Daniels'] ability to stand trial . . ., he can understand his present surroundings, he knows what the interview procedure is about and he knows the roles of the people talking with him. He knows the police version of the charges against him, he has an understanding of the possible verdicts for the offense and the possible penalties for the offense. He understands his legal rights and would understand any plea he might make.

. . .

---

[2] However, before the suppression hearing, Daniels said he wished to waive his right to a trial by jury and in this connection Daniels was sworn and questioned extensively by the court to determine if he understood the nature of the charges and his right to be tried by a jury. His answers were intelligent and appropriate.

"This man was spontaneous, coherent and relevant throughout the interview. He was oriented to time, place and person and his remote and recent memory were intact. There was no evidence of hallucinations or delusions. His affect [sic] is appropriate to the situation and he abstracts well clinically, although for the formal test do not show this. His judgment in social situations appears to be adequate, but he is of course preoccupied with his own charges against him."

It is argued here, at it was in the trial court, that because of his level of education and intelligence, Daniels was incapable of making a knowing and intelligent waiver of his rights to keep silent and to the assistance of counsel at the time the incriminating statement was made.

This Court has consistently refused to adhere to a *per se* rule of constitutional incapacity based solely on physical and mental inadequacies to waive constitutional rights. For example, see *Commonwealth v. Abrams*, 443 Pa. 295, 278 A. 2d 902 (1971), and *Commonwealth v. Camm*, 443 Pa. 253, 277 A. 2d 325 (1971). On the contrary, we have emphasized that all of the circumstances must be considered in determining if a knowing and intelligent waiver was effected. After carefully considering the instant record, we are not convinced the trial court committed an error of law in finding that Daniels fully understood his rights at the time involved, and with this understanding freely chose to waive them.

We now turn our attention to the remaining assignment of error, namely, the convictions are not supported by the evidence. Reading the record in a light most favorable to the Commonwealth, the following facts emerge.

Shortly before midnight Daniels was playing cards with four female friends in his fourth floor apartment when he answered a knock on the door and was con-

fronted by Wilson, Kellam and two other men; Wilson demanded immediate payment of a debt of $7.00 that Daniels allegedly owed him. Daniels denied the debt, told the men to leave and closed the door; three or five minutes later there was another knock or kicking on the door and Daniels went to the kitchen and placed a butcher knife in one of his pockets; when he opened the door Daniels was again confronted by the same four men, but this time Kellam did most of the talking; when Daniels again denied the debt, Kellam invited him outside; Kellam then drew his hand back and Daniels observed "something like brass knuckles on his hand with a fork sticking out;"[3] Daniels kicked Kellam and he fell down a nearby stairs; Kellam then started back up the stairs and Daniels "met him halfway"; Daniels pulled the knife and stabbed Kellam and the latter fell down; when Kellam tried to get up Daniels stabbed him again; Daniels then ascended the stairs and upon finding Wilson standing in the doorway of his apartment he stabbed him in the chest; Wilson then ran down a hallway and Daniels ran behind him and stabbed him in the back.

In view of the proof, outlined before, we agree with the appellant that the conviction based on the death of Kellam may not stand as a matter of law. The Commonwealth's own proof establishes this stabbing was committed in self-defense. The stabbing of Wilson, however, is another matter.

The killing of another human being without justification or excuse is felonious homicide. *Commonwealth v. Wucherer*, 351 Pa. 305, 41 A. 2d 574 (1945), and 4 Blackstone Commentaries, 188 (1898). But a killing is not felonious and is excusable if it is committed in self-defense. *Commonwealth v. Vassar*, 370 Pa. 551, 88 A.

---

[3] Such an instrument was found by the police in Kellam's pocket.

2d 725 (1952). The following conditions must be satisfied before one can successfully invoke the defense of self-defense: (1) the slayer must have been free from fault in provoking or continuing the difficulty which resulted in the killing; (2) the slayer must have reasonably believed that he was in imminent danger of death, great bodily harm, or some felony, and that there was a necessity to kill in order to save himself therefrom; (3) the slayer must not have violated any duty to retreat or avoid the danger. *Commonwealth v. Johnston,* 438 Pa. 485, 263 A. 2d 376 (1970).

It is clear that Daniels was without fault in provoking the altercation here involved. The Commonwealth argues however, that after initially repelling the four aggressors by kicking Kellam down the stairs, Daniels then became the aggressor by meeting him "halfway" when he started up the stairs again. We are not so persuaded.

The staircase involved was located immediately outside the door leading to Daniels' apartment and consisted of eight steps leading to a landing located midway between the 4th and 3rd floors. The record is unclear as to how many steps Kellam fell, but assuming he fell to the described landing he was not far removed from Daniels at any relevant time. When Kellam started up the stairs again brandishing a bent fork, Daniels certainly had reasonable grounds to believe he was in imminent danger of death or great bodily harm, and since he was in his own dwelling house, there was no duty to retreat. Where a man is dangerously assaulted or feloniously attacked in his own dwelling house by one not a member of his household, he need not retreat, but may stand his ground and meet deadly force with deadly force to save his own life, or to protect himself from great bodily harm. *Commonwealth v. Wilkes,* 414 Pa. 246, 199 A. 2d 411 (1964), cert. denied, 379 U.S. 939, 85 S. Ct. 344 (1964). The fact that

Daniels descended the steps part way to better repel the attack did not, under the circumstances, render him the aggressor in the relevant sense.

While self-defense is an affirmative defense, and he who asserts it has the burden of proving it by the preponderance of the evidence (*Commonwealth v. Wilkes,* supra), this burden does not exist where the Commonwealth's own evidence establishes the killing was excusable. When this occurs, as it did in the instant case insofar as the Kellam killing is concerned, the Commonwealth has then failed to establish a felonious homicide beyond a reasonable doubt, which it must do before the accused may be convicted of even voluntary manslaughter. *Commonwealth v. Flax,* 331 Pa. 145, 200 A. 632 (1938), and *Commonwealth v. Vassar,* supra.

The circumstances surrounding the stabbing of Wilson, under the proof of the Commonwealth, differ substantially. While Daniels lacked culpability in provoking the fight, he was the one responsible for continuing it once Wilson began to flee. This is evidenced by Daniels' own statement: "I don't know what happened to him [Kellam] after that because I turned around quickly and went back up the stairs, Dempsey [Wilson] was still in front of my door, he was making an effort at me, and I stabbed him, he ran down the hall and I came right behind him, I think I stabbed him again, he said 'Joe don't kill me', and that's when I stopped." In the situation where the original assailant attempts to flee and is pursued by his intended victim, the assailant becomes the assaulted. Here once Wilson attempted to flee[4] from Daniels and the latter continued the altercation by pursuing him, Daniels then became the aggressor and was not acting in self-defense.

---

[4] Wilson was going down the hallway from appellant's apartment. This hallway leads to another exit of the building.

The judgment of sentence imposed for the killing of Wilson is affirmed. The judgment of sentence imposed for the killing of Kellam is reversed.

Mr. Justice ROBERTS and Mr. Justice NIX concur in the result.

———

CONCURRING AND DISSENTING OPINION BY MR. JUSTICE POMEROY:

I agree with the Court that the killing by the appellant Daniels of Dempsey Wilson cannot as a matter of law be regarded as justified under a claim of self-defense. I am unable to agree, however, that the killing of Perry Kellam—appellant's first victim—can and should be so regarded.

Two reasons compel my dissent with respect to the Kellam homicide:

*First*: The statement given by appellant to police and introduced by the Commonwealth at trial contains the following concerning Kellam's [Pumpkin's] death: "I kicked him and he fell down the steps, Pumpkin started back up the stairs and I met him halfway. I pulled my knife out of my right rear pocket while going down the stairs to meet Pumpkin, I stabbed at Pumpkin with the butcher knife in my right hand, *he fell down, he tried to get up and I think I stabbed him again.*" (Emphasis added.) The evidence developed no different version of what happened than this statement of the appellant.

We have recently said that one of the elements which must be established to show that a killing was in self-defense is that "[t]he slayer must have reasonably believed that he was in imminent danger of death, great bodily harm, or some felony, and that there was a necessity to kill in order to save himself therefrom." *Commonwealth v. Johnston*, 438 Pa. 485, 489, 263 A. 2d 376 (1970). Accepting the view that appellant was acting in self-defense when he left his apartment, knife

in hand to confront Kellam, it escapes me how, particularly at the appellate level, it can be said *as a matter of law* that Daniels entertained a reasonable belief that he was in imminent danger of death and that there was a necessity to kill in order to save himself when his assailant *had been once stabbed, had fallen down, and was trying to get up.* The judge who was acting as factfinder did not so interpret the evidence presented to him; I see no basis for this Court to do so.

*Second*: My greater concern with the Court's decision, however, is that it assumes, without a word of discussion, that the common hallway of an apartment house is a no-retreat area for purposes of our law of self-defense.

The law of this Commonwealth, as is well known, is that when faced with an assault of deadly force while in his own home, *Commonwealth v. Wilkes,* 414 Pa. 246, 199 A. 2d 411 (1964), or in his place of business, *Commonwealth v. Johnston,* supra,[1] a man need not retreat but may stand his ground and meet the attack with deadly force of his own. My research reveals that we have never considered the question of whether common hallways or stairways of apartment houses are no-retreat areas, and that only one jurisdiction, New York, has any law at all on the subject. In *People v. Childs,* 21 A.D. 2d 809, 810, 250 N.Y.S. 2d 926, 928 (1964), it was held that "[t]he apartments on the floor led to a common hallway which, in turn, opened onto the back porch. The latter was not part of the defendant's home as a matter of law." That case in turn relied on *People v. Tomlins,* 213 N.Y. 240, 107 N.E. 496 (1914), where CARDOZO, J., made the following observations in answer to a litigant's argument: "The cases in this court relied

---

[1] The writer of this opinion did not agree with the extension of the no-retreat doctrine to a person's place of business. See *Commonwealth v. Johnston,* 438 Pa. at 492 (POMEROY, J., dissenting).

on by counsel for the people hold nothing to the contrary. People v. Sullivan, 7 N.Y. 396, is referred to as a case where the homicide was in the defendant's dwelling. The murdered man and the defendant lived in a boarding house. Their rooms were on different floors. The affray started in the defendant's room. The two men separated, and the defendant's victim went downstairs. At the foot of the stairs he turned and went back. *The defendant, instead of taking shelter in his own room, remained on the landing of the stairway.* The fight was renewed, and the murder followed. It was with reference to that situation that the court said that the defendant was under a duty to avoid the encounter. *He had only to enter his own room and he would have been safe.* The court did not hold that it was his duty to abandon his home and take refuge in the streets." (Emphasis supplied.)

In a society that has come increasingly to live in apartments abutted by common hallways and staircases, the question implicit in this case assumes particular significance were we to consider it with the care which it warrants. Were we to agree, as I am satisfied we should, that one faced with an assault of deadly force while in an apartment hallway must retreat to his own apartment (if by doing so he could reduce the risk to his own life), then obviously appellant here could not establish self-defense in rushing in an aggressive manner from a no-retreat area (doorway of an apartment) *into* a retreat area.[2]

For the reasons indicated, I respectfully dissent.

Mr. Chief Justice JONES joins in this concurring and dissenting opinion.

---

[2] In *People v. Bonano*, 59 N. J. 515, 284 A. 2d 349 (1971), it was recognized that a doorway of a residence is an area from which no retreat is required.

CONCURRING AND DISSENTING OPINION BY MR. JUSTICE MANDERINO:

I concur in the majority's reversal of the judgment of sentence for the killing of Kellam, but I cannot concur in the affirmance of the judgment of sentence for the killing of Wilson.

The majority attempts to compartmentalize a single episode in which the appellant reasonably feared aggression from four men in the hallway outside appellant's apartment.

Appellant was sitting at home minding his own business, when four aggressive men knocked at his door. They leave the first time, but return shortly thereafter. Appellant, who had several visitors in his apartment, reasonably stepped into the hall rather than expose his visitors to the four aggressive intruders. One of them brandishes a dangerous weapon, another came at the appellant. In the course of the entire episode, appellant stabs two of the men. Under the majority's view the four men should have been individually checked and searched by the appellant before he moved against any of them. An episode, such as that which occurred in this case, cannot be broken up. At the time appellant stabbed Wilson, two of the group of four men were still in the hallway outside appellant's apartment. What was the appellant to do when a second man came at him after he had already found it necessary, in self-defense, to stab the first man? He could hardly have been expected to leave the second man alone while there were still present in the hallway the third and fourth members of the gang. How would the appellant know what these two men would do, or what weapons they had? The majority analyzes the factual situation as though there were four unrelated aggressors. There was actually one single aggressor which can fairly be called a gang and as long as the gang was threatening, the appellant had a right to defend himself.

The majority not only splits up the episode as though a computer were at hand, but it relies on the appellant's statement that he stabbed Wilson as he ran down the hall. Wilson was not running toward a customary exit. Why would a reasonable man think Wilson was retreating permanently? Wilson could easily have turned back toward the appellant and continued his aggression, particularly since two members of the gang were still there.

What happened in this case could happen to any citizen who is minding his own business, sitting at home with friends. Four aggressors with weapons arrive and start something endangering appellant's life. Within a few minutes, in self-defense, appellant stabs two of them. How can we possibly justify one killing and not the other? The appellant's judgment of sentence should be reversed as to both Kellam and Wilson.