355 A.2d 572
**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Ruth JACKSON, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 24, 1975.

Decided April 7, 1976.

184

Rudolph S. Pallastrone, George A. Bachetti, Philadelphia, for appellant.

F. Emmett Fitzpatrick, Dist. Atty., Steven H. Goldblatt, Asst. Dist. Atty., Chief, Appeals Div., Glen Gitomer, Philadelphia, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

EAGEN, Justice.

Appellant, Ruth Jackson, was found guilty of voluntary manslaughter following a nonjury trial. Motions in arrest of judgment and/or a new trial were denied and a term of psychiatric probation was imposed. This appeal followed.

Throughout, Jackson has argued that this homicide was justifiable since she acted to prevent the infliction of great bodily harm on her niece, Anita Peake. The trial court rejected this position stating an aunt-niece relationship is not sufficiently close kinship to justify one intervening to defend the other. While the trial court was correct in ruling that the kinship in this case was not close enough to permit Jackson to employ the defense of defending a near relative, that is, a husband, wife, child or servant, *Commonwealth v. Russogulo*, 263

Pa. 93, 106 A. 180 (1919); *Commonwealth v. Paese*, 220 Pa. 371, 69 A. 891 (1908), the trial court ignored an overlapping,[1] but stricter,[2] defense available to any person acting to prevent the commission of a felony:

> "For the protection of the weak and unfortunate and the assertion of the duties of humanity, reliance must

1. See R. Perkins, Criminal Law, 989 (2d ed. 1969):
   "Important privileges overlap. They are the privilege (1) to intervene for the purpose of preventing the perpetration of a crime and (2) to defend person or property. To the extent of the overlap both privileges are available to the one thus benefited. 'It is not necessary that he should intervene solely for the purpose of protecting the public order or of protecting the private interests imperiled. His act, though a single one, may well be done for both purposes. If so, either privilege is available to him.' "

2. The defense of acting in defense of another to prevent a felony has traditionally been more strictly construed than the defense of acting in defense of a near relative. For example, the slayer, acting in defense of a near relative, may be legally justified even though the relative defended was an aggressor. *Fagan v. State*, 112 Tex.Cr.R. 107, 14 S.W.2d 838 (1929); see also *Moore v. State*, 25 Okl.Cr. 151, 219 P. 175 (1923); *Mitchell v. State*, 43 Fla. 188, 30 So. 803 (1901). However, one intervening to prevent a felony may not defend an aggressor or a discharge becomes unavailable even though the slayer's belief that the person defended was a victim and not an aggressor was reasonable. See *People v. Maine*, 166 N.Y. 50, 59 N.E. 696 (1901); see, also, *Commonwealth v. Russogulo*, supra. This distinction has traditionally been rationalized on the basis of the relationship between the defender and the defended; the law recognizing the passions aroused in the respective situations:
   > "[I]t may perhaps be said that the potentiality for deterring the actor from the use of force is greater when he is protecting a stranger than where he is protecting himself or a loved one, because in the former case the interest protected is of relatively less importance to him; moreover the potential incidence of mistake in estimating fault or the need for action on his part is increased where the defendant is protecting a stranger, because in such circumstances he is less likely to know which party to the quarrel is in the right." Model Penal Code, § 3.05, Comment at 32 (Tent. Drafts 8, 9 and 10, 1958).

   In either case, however, a reasonable mistake of fact may operate to mitigate what would otherwise be murder to voluntary manslaughter. See *Commonwealth v. Paese*, supra.

   However, as to offenses committed after June 6, 1973, the distinction is immaterial. The Act of December 6, 1972, P.L. ——, No. 334, § 1 (eff. June 6, 1973), 18 C.P.S.A. § 506 (substantially adopting the Model Penal Code recommendations) consolidates common law defenses for the protection of other persons

be had on the ancient and settled right to interfere to prevent a felony, with its well-guarded limitations that the injury to be prevented must be serious, must be imminent and not past, the quarrel in actual progress, and the necessity for the use of a deadly weapon clear of doubt." [Citations omitted.]

*Commonwealth v. Pease,* supra at 378, 69 A. at 894; see also *Commonwealth v. Russogulo,* supra. Therefore, the issue presented by this appeal is whether Jackson has established the common law defense available to those acting to prevent a felony. If so, she is entitled to arrest the judgment.

At trial, Mrs. Anita Peake, appellant's niece and a witness for the Commonwealth, testified that on September 17, 1971, Mrs. Peake, Charolette Jackson,[3] Frank Shepard, John Sims and a man named "Bob" were drinking heavily in the Peake residence. An argument ensued purportedly between "Bob" and John Sims over Charolette Jackson's affections. Sims drew a knife and Mrs. Peake grabbed a hacksaw blade and a butcher knife from the dining room table. Peake then ordered every one out of the house and all exited.

Mrs. Peake further testified that, once outside, Sims, knife in hand, continued to argue with Charolette Jackson, not with Mrs. Peake. The appellant then ran across the street, interposed herself between Peake, who was standing in her doorway, and Sims, who was standing ten feet away. Appellant took the knife from Peake, ran toward Sims and stabbed him in the neck.[4]

and allows for a reasonable mistake of fact. See also Model Penal Code, supra Comment. The instant offense, committed on September 17, 1971, must be examined under the then existing rule which does not allow for a reasonable mistake of fact, that is, unless Peake was not the aggressor instantly, this defense is unavailable to Jackson.

3. Charolette Jackson and appellant, Ruth Jackson, are not related by either blood or marriage.

4. In his opinion, the trial judge specifically stated that he was persuaded that Anita Peake and Frank Shepard, Peake's boy

The appellant testified in her own behalf as follows. She lived across the street from her niece, and heard arguing emanating from the Peake house. Later, she looked out her second floor window and saw Sims and her niece on the stoop swinging knives at each other. Appellant ran across the street, unarmed, interposed herself between the two parties and told Sims not to hurt her niece. At that point, Peake stood in her doorway and Sims stood at the bottom of a five step stairway leading to the Peake house with one foot on the bottom step, leaning toward the two women (a distance of approximately three feet). Sims swung his knife and advanced to the second step. Jackson backed away until she came in contact with her niece, Sims swung again and Peake gave her knife to her aunt. Jackson swung back at Sims, inflicting the fatal wound.[5]

A statement of the applicable law is set out in 40 C.J. S. Homicide § 108a (1944):

"As a general proposition, a person is justified or excused in killing in defense of another person when, and only when, the circumstances are such that the latter person would be justified or excused if he had committed the homicide in his own defense. A person inter-

friend who testified that he heard no threats and saw no knives, had not testified candidly and truthfully. Both had given statements to police on the day of the incident indicating that the argument was actually between Peake and Sims and that Sims and Peake stood close together attempting to stab one another.

On the other hand, the trial court specifically found Ruth Jackson's testimony credible. Her in-court testimony conformed to her statement to police on the day of the incident and contained no internal contradictions. The trial judge stated that he would use Jackson's account of the incident in determining culpability in this case.

5. Jackson does not contest that she did the stabbing. A report from the medical examiner confirmed that Sims' death was caused by a single stab wound of the neck. Although that report also stated that there was an incised wound on decedent's chest and five superficially incised wounds on his left forearm. Jackson only struck Sims once. Sims' other wounds were inflicted before Jackson's intervention.

fering in a difficulty in behalf of another simply steps into the latter's shoes; he may lawfully do in another's defense what such other might lawfully do in his own defense but no more; he stands on the same plane, is entitled to the same rights, and is subject to the same conditions, limitations, and responsibilities as the person defended; and his act must receive the same construction as the act of the person defended would receive if the homicide had been committed by him. . . . [i]n general it is necessary and sufficient to justify or excuse a homicide in defense of another that neither the person defended nor the defender shall be at fault in [provoking] the difficulty, . . . that the danger, real or apparent, to the person defended shall be of death, great bodily harm, or a felony; that it shall be present, imminent and impending, and not a past danger; that either the person defended shall be in real danger of death, great bodily harm, or some felony at the time, or it shall be reasonably apparent to the slayer, or he shall honestly and reasonably believe, that the person defended is in such danger, and that it is necessary to kill to save him therefrom; that the person defended shall retreat if he can do so without increasing his peril; that neither the person defended nor accused could have averted the apparent danger by any reasonably safe means other than the killing of deceased; and that the defender shall not use more force than is necessary or reasonably appears to him to be necessary to save the person defended from death or great bodily harm."

40 C.J.S. Homicide § 108 at 968–69 (1944).

■ Therefore, if appellant honestly and reasonably believed that Peake was in imminent danger of death or great bodily harm, she was entitled to go to her defense. The distance between the combatants and the wounds indicated in the medical examiner's report indicate a vigorous confrontation in which Sims seemed bent on retali-

ation. Under such circumstances, Peake was sufficiently imperiled, Jackson's belief was reasonable and she was entitled to go to Peake's defense.

■ Since an actor who is entitled to go to the defense of another steps into the shoes of the person defended, we must determine if the elements of self-defense have been established instantly. In order for appellant's actions to be justifiable, the evidence must show: (1) both Peake and Jackson were free from fault in provoking or continuing the difficulty; (2) either Peake was, in fact, in imminent danger, or it was reasonably apparent to Jackson that Peake was in imminent danger, or Jackson honestly and reasonably believed that Peake was in danger of great bodily harm or some felony and there was a necessity to kill in order to save her therefrom; and (3) neither Peake nor Jackson violated any duty to retreat. *Commonwealth v. Johnston*, 438 Pa. 485, 263 A. 2d 376 (1970). See also *Commonwealth v. Russogulo*, supra.

■■ We agree with the trial court that at no time was Peake the aggressor. Sims drew a knife during an argument in her residence and she exercised her right to eject Sims with equal force. *Commonwealth v. Johnston*, supra. Similarly, Jackson's intervention in the quarrel does not make her the aggressor since, as discussed above, she was entitled to go to Peake's defense. Cf. *Commonwealth v. Johnston*, supra.

■ Next, given the fact that Sims and Peake stood two to three feet apart slashing at one another with knives, there can be no doubt that Peake was in imminent danger of great bodily harm and that was readily apparent to Ruth Jackson.[6] Since Sims continued to

6. In *Commonwealth v. Daniels*, 451 Pa. 163, 301 A.2d 841 (1973), where the slayer and attacker were armed as here but stood on opposite ends of an eight step stairway (twice the distance as the instant case), the Court held that there was reasonable ground for the slayer to believe that he was in imminent danger of great

slash at both Jackson and Peake following Jackson's interposition and admonition to stop, the use of deadly force was necessary. Cf. *Commonwealth v. Daniels*, 451 Pa. 163, 301 A.2d 841 (1973); *Commonwealth v. Johnston*, supra.

Finally, neither Peake nor Jackson violated any duty to retreat. Peake stood in the doorway of her own dwelling house, a "no retreat" area.[7] See *Commonwealth v. Johnston*, supra; *People v. Bonano*, 59 N.J. 515, 284 A.2d 345 (1971). Jackson, who assumes the same rights and limitations as Peake, similarly had no duty to retreat. Even if she had such a duty, it had not been violated. As Sims lunged, advancing to the second step, Jackson, then unarmed, drew back until she came in contact with her niece. From this position, Jackson could neither fall back, being obstructed by Peake, nor descend the steps to face an armed attacker.

Since the elements of the defense have been adequately shown, the judgment of the lower court is reversed and the record remanded with instructions to discharge Jackson.

MANDERINO, J., filed a concurring opinion in which ROBERTS, J., joined.

NIX, J., concurred in the result.

POMEROY, J., dissented.

bodily harm. In *Commonwealth v. Johnston*, 438 Pa. 485, 263 A.2d 376 (1970), where the slayer, armed with a gun, shot the attacker, armed with a knife, at a distance of six feet, the Court also held that the slayer had reasonable grounds to believe that he was in imminent danger. Here, the parties stood two to three feet apart, clearly within a zone of danger.

7. The Crimes Code, Act of December 6, 1972, P.L. ——, No. 334, § 1 (eff. June 6, 1973), 18 C.P.S.A. § 501, which codifies defenses in Pennsylvania defines "dwelling" as "[A]ny building or structure . . .. or portion thereof, which is for the time being the home or place of lodging of the actor." Therefore, as to offenses after June 6, 1973, a doorway is clearly a no retreat area in Pennsylvania.

MANDERINO, Justice (concurring).

I join in the opinion of Mr. Justice Eagen. I should like to note, however, that I am unable to discern any rational basis for distinguishing between the standards applicable to a person acting in defense of a near relative and those applicable to a person coming to the defense of one who is not a near relative. As Mr. Justice Eagen has noted, because of recent legislation, the distinction is immaterial as to offenses committed after June 6, 1973. The distinction should not be applied to offenses committed before that date. The traditional basis for the distinction was that a "near relative" was "a loved one" while other persons were not. Accepting that human conduct can be significantly affected by the love of another, it does not follow that one may rationally infer that near relatives are always loved and other persons are never loved. Thus, the distinction should be discarded.

ROBERTS, J., joins in this concurring opinion.