Commonwealth *v.* Moore, Appellant.

Argued November 9, 1959. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and McBRIDE, JJ.

*John J. Krafsig, Jr.,* for appellant.

*John A. Roe,* Assistant District Attorney, with him *H. F. Dowling,* District Attorney, for appellee.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, December 31, 1959:

The defendant, Leola Moore, was found guilty of voluntary manslaughter by a jury in the Court of

Oyer and Terminer of Dauphin County and by that court sentenced to pay a fine of $5. and to be committed to the State Industrial Home for Women for an indeterminate term. From that judgment of sentence this appeal was taken.

Isaac David Moore and Leola Moore, husband and wife, lived at 1608 Wallace Street, Harrisburg, having come to Harrisburg from South Carolina several years prior to the incident which gave rise to this criminal prosecution. On the mid-afternoon of July 5, 1958, in his home, Isaac Moore received at the hands of Leola Moore, the defendant, a wound which resulted in his death.[1]

At approximately 3:15 p.m. on that date the deceased entered his home and, finding the defendant in the dining room, inquired why she had not prepared anything to eat; the defendant explained that she had cleaned the kitchen floor and was waiting for it to dry but the deceased, instead of accepting this explanation, cursed defendant. The defendant went into the kitchen followed by the deceased. Defendant picked up a butcher knife, $11\frac{1}{8}$ inches long, and returned to the dining room. The deceased from the kitchen threw a portable radio at defendant which, according to defendant, struck her and, according to the Commonwealth, landed near her feet. Defendant then started toward the living room and the deceased started following her. Defendant turned, raised her arm and stabbed the deceased inflicting a wound which caused his death within an hour. Although unarmed as he followed defendant, the deceased was saying something and in an angry mood. There was no evidence of any attempt

---

[1] The cause of death was described by Dr. Lippard: "I found a penetrating wound which entered his body through the left shoulder, entered the chest and entered a major vessel leaving his heart. This wound led to a massive fatal hemorrhage, which was the cause of death."

on defendant's part to run away from deceased, although there was evidence on the part of the Commonwealth that she could have left the house by the back door before her husband followed her to the kitchen or by the front door after deceased had thrown the radio at her.

Dr. Lippard described the character of the wound inflicted: "Yes, the wound, as I say, entered the soft parts of shoulder. It went behind the main bone of the arm. It vented, of course, across the arm pit and then entered the chest between the fourth and fifth ribs. It then went across the chest and cut open the sac which covers the heart. It then terminated at one of the major arteries which leave the heart, the pulmonary artery." Although the knife blade was $11\frac{1}{8}$ inches long the wound to the pulmonary artery was somewhat longer from which the inference may be drawn that the knife was wielded with force.

Defendant contends: (1) the trial court erred in overruling her demurrer at the close of the Commonwealth's case and thus her motion in arrest of judgment should be granted; (2) the trial court was in error in allowing the jurors to deliberate for eleven hours— 7:08 p.m. to 6:10 a.m.—without making any provision for them to rest and sleep; (3) the trial court erred in permitting the Commonwealth, in rebuttal, to present the testimony of a witness concerning a threat alleged to have been made by defendant four months prior to the homicide; (4) the verdict of the jury was against the weight of the evidence.

Defendant's first contention, i.e., that her motion in arrest of judgment should be granted, is premised upon the alleged failure of the Commonwealth to prove that the killing of deceased was intentional. In considering this contention the defendant would have us review the refusal of the court below to sustain her demurrer which we cannot do: *Commonwealth v.*

*Spanos,* 167 Pa. Superior Ct. 629, 631, 76 A. 2d 243 and cases therein cited. The Act of June 15, 1951, P.L. 585, §1, 19 PS §871, provides: "Hereafter, in all criminal prosecutions in this Commonwealth in which the jury shall have rendered a verdict against the defendant, the defendant may . . . make a motion in arrest of judgment on the grounds that the evidence was insufficient to sustain the charge, and if the Court, after consideration of the entire record, shall decide that there is not sufficient evidence to sustain the conviction, it shall forthwith discharge the defendant and dismiss the case." Under this statutory provision we consider the "entire record" in passing upon the motion in arrest of judgment and, in so doing, the sufficiency of the evidence must be tested according to the Commonwealth's testimony and the reasonable inferences arising therefrom: *Commonwealth v. Wright,* 383 Pa. 532, 119 A. 2d 492; *Commonwealth v. Jackson,* 187 Pa. Superior Ct. 2, 144 A. 2d 249; *Commonwealth v. Elias,* 186 Pa. Superior Ct. 137, 140 A. 2d 341.

Time and time again this Court has held that the fatal use of a deadly weapon against a vital part of the body of another, when established as a fact, warrants the inference that the act was done with the specific intent to take life.[2] Our present Chief Justice, speak-

---

[2] The distinction between murder and manslaughter is the presence or absence of malice. The specific intent that death shall result is not essential to a finding of voluntary manslaughter. While it is true that a specific intent to take life, coupled with adequate provocation and passion, constitutes voluntary manslaughter rather than murder in the first or second degree, it is equally true that an intent to inflict serious bodily injury, which results in death, coupled with adequate provocation and passion, does not constitute murder in the second degree but is voluntary manslaughter. It is seen, therefore, that where there is a non-malicious felonious killing with a specific intent either to kill or to seriously injure, it is voluntary manslaughter. Compare *Commonwealth v. Vanchaski,* 42 Pa. Superior Ct. 294.

ing for this Court in *Commonwealth v. Samuel Jones,* 355 Pa. 522, 526, 50 A. 2d 317, stated: "It is in respect of the alleged intent to take life that the appellant ascribes failure to the Commonwealth's proofs in the instant case, apparently overlooking the fact that such intent, being subjective, is often unsusceptible of direct proof but must be found in the implications of objective manifestations, such as the character of the weapon used by the slayer. Not infrequently, therefore, specific intent to take life is shown by proof of the offender's use of a deadly weapon, for while an intention to kill may be shown by the defendant's expressed words or declarations or other conduct, such intent may be just as effectively inferred from the deliberate use of a deadly weapon upon a vital part for a manifest purpose: [citing cases]." See also: *Commonwealth v. Nelson,* 396 Pa. 359, 152 A. 2d 913; *Commonwealth v. Ballem,* 386 Pa. 20, 123 A. 2d 728; *Commonwealth v. Vassar,* 370 Pa. 551, 561, 88 A. 2d 725; *Commonwealth v. Wucherer,* 351 Pa. 305, 312, 41 A. 2d 574; *Commonwealth v. Kelly,* 333 Pa. 280, 4 A. 2d 805; *Commonwealth v. Drum,* 58 Pa. 9. Apparently conceding that the knife was a "deadly weapon," defendant argues that the knife was not used on a "vital part" of deceased's body and, therefore, the inference of a specific intent to kill did not arise. In this connection it is argued that Dr. Lippard changed his testimony in respect to whether or not the wound was inflicted on a "vital part" of the deceased's body. On direct examination Dr. Lippard testified: "Q. Now Doctor, there has been some reference in remarks in this case as to vital parts of the body. Would you determine from your experience whether or not you regard the area wounded as a vital part of the body? A. Yes, *definitely a most vital part of the body."* (Emphasis supplied). On cross-examination the doctor testified: "Q. Now, do you consider the fleshy part of the arm behind the bone as a vital part

of the body? A. No." It is obvious that the doctor did not change his testimony and that in his opinion the area wounded was a "vital part" of deceased's body. The court below in its opinion well covered this situation: "The fact that in reaching this most vital part of the body the knife passed through the flesh of the upper arm is of no moment. A weapon *may* be used in such a way that death is improbable; however, we must consider not only the nature of the weapon, but also the manner in which it is used and all the attending circumstances: Commonwealth v. Kluska, 333 Pa. 65 (1939). In the instant case the weapon is a butcher knife 11 inches long, secured and used by the defendant against her husband who was unarmed and thrust with such force and in such a manner that it caused a stabbing wound longer than its blade in a diagonal path into the heart." No more vital area exists in the human body than the heart area; it was in this area that defendant wounded her husband and from the use of the knife in the manner in which it was employed, from the wound which it inflicted and under all the circumstances the inference was fully warranted that defendant's act was done with the specific intent to take life. This contention of the defendant is without merit.

Defendant next argues that the court erred in keeping the jury together for an unusually long time without opportunity to rest and thus prejudiced the defendant. During the trial the jury had had rooms at the Penn-Harris Hotel. On the last day of the trial the jurors checked out of the hotel and brought their luggage with them to the courthouse. The jury retired for deliberation on the verdict at 7:08 p.m. after which time the jurors were fed. At 11:15 p.m. the jury requested and were given additional instructions on the various degrees of homicide and, in the words of the trial judge, at that time "gave no indications of fatigue

or illness." At approximately 3 a.m. counsel for the defendant requested that the jury be given sleeping quarters and that their deliberation be suspended while they rested and slept, but this request was refused. On his own volition the trial judge called the jury into the court room at 5:00 a.m. The following colloquy then took place: "THE COURT: Are there any questions that you think the Court might be able to answer; any additional questions that you might have that would help? This is, of course, an important case, as you well know, and you have deliberated on it very conscientiously. It is an important case to both the Commonwealth and the defense and the verdict, of course, must be unanimous, and we want to give you every opportunity to continue to deliberate, hoping that you can come to a unanimous verdict. THE FORELADY: Your Honor, I as Forelady—we have deadlocked as far as I am concerned. THE COURT: And you feel that any longer deliberations would not solve the deadlock, is that what you mean? THE FORELADY: We have been trying. THE COURT: Well, we are going to send you back again for another effort to see if you can't come to a unanimous verdict, and we urge you to make every effort to do that." The jury finally reached a verdict at 6:08 a.m.

Defendant argues that it was reversible error on the part of the trial court to require such extended deliberation without rest for the jurors of whom ten were women. It is very significant that the jurors made no complaint nor any request that their deliberations be suspended and that they be given an opportunity to rest.

Many years ago in *People v. Olcott*, 2 Johns. Cas. 301, Mr. Justice KENT said: "The doctrine of compelling a jury to unanimity by the pains of hunger and fatigue, so that the verdict in fact be founded not on temperate discussion and clear conviction, but on strength of

body, is a monstrous doctrine that does not, as St. Germain evidently hints, stand with conscience, but is altogether repugnant to a sense of humanity and justice." A verdict brought about by judicial coercion is a nullity in the eyes of the law: *Miller v. Miller,* 187 Pa. 572. If the instant verdict were brought about by any compulsion or if there was anything of record to indicate that the instant verdict was reached because of the jurors' desire for rest and sleep or fatigue we would have no hesitancy in setting such verdict aside. However the instant record does not disclose such motivation for this verdict. The extent of time during which a jury is kept together for deliberation is a matter within the discretion of the trial judge; only for an abuse of such discretion should his action be reversed. Defendant argues that the court violated the Act of August 9, 1955, P. L. 323, §2336, 16 PS §2336, which provides that the county commissioners "shall provide and maintain a separate room or rooms, at or adjoining the Court House, upon order of the Court, for the comfort, accommodation and convenience of woman jurors, and such rooms shall be provided with suitable furniture for the use of women jurors who may be serving upon juries unable to bring in verdicts upon the day in which the case was placed in their hands. . . ." We fail to follow the logic of this argument in its applicability to this case. There is no evidence of record that appropriate quarters for the women jurors had not been provided nor that any request was made on the part of any of the jurors that the jury's deliberations be suspended and that provision be made for appropriate quarters for rest and sleep during the suspension of such deliberations. In *Commonwealth v. Tenbroeck,* 265 Pa. 251, 108 A. 635, affirming a verdict of second degree murder, this Court said: "The jury, after forty-eight hours' deliberation, came into court and reported their inability to agree

upon a verdict, whereupon the trial judge explained the nature of the case and importance of reaching a verdict and said, 'You must agree,' but added, 'If someone of you should become physically unable to remain, the situation would be different, but as long as you are physically able to remain, it is your duty to undertake to agree.' He also expressed great sympathy for the jury and enjoined them to continue their deliberations. Considering, as we must, all, that the judge said, it did not constitute such a coercion of the jury as to invalidate the verdict . . . ." We find nothing to substantiate the defendant's charge that this verdict was arrived at through any judicial coercion or because of fatigue from lack of rest.

Defendant's third contention is that the trial court erred in permitting the reception into evidence of the rebuttal testimony of a Commonwealth witness, Constable Grimwood. The defendant had taken the stand and had testified, inter alia, that she loved her husband, had never threatened to kill him and had never told anyone that she would kill him. Grimwood testified that, in March 1958, he was attempting to apprehend the deceased and, while chasing deceased through his home, defendant said "If you don't soon get him, you will be coming after me, because I am going to kill him." The court admitted this testimony for two purposes; first, as it might affect the credibility of the defendant and second, to show possible intent. For both purposes this testimony was clearly admissible. In *Commonwealth v. Minnich*, 250 Pa. 363, 371, 95 A. 565, we stated: "With respect to this latter it need only be said that threats and all declarations of personal hostility are admissible in evidence, as showing malice and tending to show criminal intent charged." To the same effect see: *Commonwealth v. Patskin*, 372 Pa. 402, 93 A. 2d 704; *Commonwealth v. Peyton*, 360 Pa. 441, 62 A. 2d 37; *Commonwealth v. Minoff*, 363 Pa. 287, 69 A. 2d 145.

Lastly, defendant contends that she is entitled to a new trial on the ground that the verdict was against the weight of the evidence. We have made an independent review of both the applicable law and the evidence and we are satisfied that the Commonwealth presented evidence which not only fully supported the present verdict but would have supported a verdict of murder. The defendant, from our examination of the evidence, was indeed fortunate to have received a manslaughter, rather than a murder, verdict.

Judgment of sentence affirmed.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

On the morning of September 11, 1958, the jurors in this case, who had been hearing evidence for three days, were instructed by the Court attaches to check out of the hotel in which they had been lodged, pick up their luggage and report to the courtroom for the final day of the trial. At 7:08 that evening, after receiving instructions from the Judge on the subjects of murder and manslaughter, the jurors took up the case for deliberation, discussion and verdict. At 11:15 p.m., they requested further instructions which were given to them in the courtroom and they once more retired to the jury room.

At 3 a.m., no word having been received on the possibility of a verdict that night, defendant's counsel requested the Trial Judge to assign sleeping quarters to the jury. This request was refused. At 5 a.m., the Judge called the jury into the courtroom and the following ensued: "THE COURT: Are there any questions that you think the Court might be able to answer; any additional questions that you might have that would help? This is, of course, an important case, as you well know, and you have deliberated on it very con-

scientiously. It is an important case to both the Commonwealth and the defense and the verdict, of course, must be unanimous, and we want to give you every opportunity to continue to deliberate, hoping that you can come to a unanimous verdict. THE FORELADY: Your Honor, I as Forelady—we have deadlocked as far as I am concerned. THE COURT: And you feel that any longer deliberations would not solve the deadlock, is that what you mean? THE FORELADY: We have been trying. THE COURT: Well, we are going to send you back again for another effort to see if you can't come to a unanimous verdict, and *we urge you to make every effort to do that.*" (Emphasis supplied.)

At 6:08 a.m., the jury returned a verdict of voluntary manslaughter. The defendant seeks a new trial, asserting that the verdict, in effect, was a coerced one since the jurors were compelled by the Judge to reach a unanimous verdict at a time when they were exhausted from lack of sleep and thus were not able physically to conscientiously discharge their duties.

I would grant a new trial because I believe that the facts justify the conclusion that the verdict was not the unanimous will of twelve persons free from the demands of disabling Nature clamoring for rest. The Majority Opinion quotes the Trial Judge as saying that when, at 11:15 p.m., he delivered additional instructions, the jury "gave no indications of fatigue or illness." But this was still at a reasonable hour. There was no reason for the jury to have been helplessly fatigued at 11:15 p.m. However, this was still a long distance from 5 a.m. In six hours the pendulum of the clock swings thousands of times and, with each stroke, after midnight, the eyelids of the average person become heavier, the muscles tire, the brain loses alertness and, as a consequence, attention flags, concentration weakens, resolution droops, determination falters, and eventually a sleepless juror may well lose

the will of resistance and become, like a rudderless ship at sea, the prey of every influence abroad on the waves of pressure and importunity.

A juror needs sleep as much as Macbeth.

In answering the defendant's argument that the jury was coerced into a verdict by physical exhaustion, the Majority Opinion says: "It is very significant that the jurors made no complaint nor any request that their deliberations be suspended and that they be given an opportunity to rest." This observation is artless and, with due respect, I must say that it is almost naive. Who were the jurors to stand up in the jury box and protest against the omnipotence of the Court? No one informed them that they had the right to ask for a suspension of their deliberations until they had been refreshed with rest and slumber. They had been told that very morning that there would be no sleeping accommodations for them any more; they were given their suitcases. In every way that human intelligence can understand, they could only conclude that they had to reach a verdict before they could get to a bed again, and this time it had to be the bed in their own homes.

Who gave the orders that the jurors release their rooms at the hotel while the trial was still in progress? Who assumed the clairvoyant powers to tell them that the trial would be over and the verdict rendered that day?

It is amazing to me how some judges will allow a trial to move on tortoise feet throughout the unfoldment of the evidence and then, when the most important phase of the trial, and, in fact, the only reason for which a trial is held, becomes imminent, everyone is exhorted to hurry. The lawyers must limit their arguments, the jury must deliberate quickly, the verdict must be reached speedily, and justice must be satisfied on the run. Just as the ship of justice is

about to be launched, when the slightest miscalculation and carelessness will capsize it, everyone seems to feel that the important thing is to get home. It is all inexplicable.

Instead of placing the blame where it belongs, on the Trial Judge who allows, permits and encourages this headlong procedural helter-skelter, the Majority attempts to shift the fault to the jury. The Majority Opinion says, as already stated, that the jury should have complained. But to say that jurors may complain is like saying that a recruit in the army or navy may complain when his superior officer orders him on a detail of duty. Appellate courts often overlook that jurors are novices in the ways of the law, that they are strangers in an unexplored land, that they are children in the presence of awesome authority. Their every physical movement is guided and controlled by the Judge and the Court attaches. When the Judge said to the jurors that: "We are going to send you back again for another effort to see if you can't come to a unanimous verdict, and we urge you to make every effort to do that", his words were like a royal invitation, they constituted a command.

During his entire speech to the jury at 5 a.m., the Judge made not the slightest suggestion that if they desired rest and needed sleep, he would see that they got it. What the Judge said was that he wanted a verdict, a unanimous verdict. He said this in courteous language, of course, but in words which could have left no doubt in the minds of the jury that he regarded it as their duty to return a verdict, and return it quickly.

With the Judge's importuning words ringing in their ears, the jurors left the courtroom at 5 a.m., and returned with a verdict at 6:05 a.m. What happened in that hour? It is obvious what happened. Flesh overcame will, exhaustion broke down resolution, the

legions of sleep conquered the forces of vigilance. The verdict finally rendered may have been a correct one, but it also may have been an irresponsible one.

There was a time when I wondered why it was that, even with so-called third degree methods, prisoners would confess to deeds which they could not possibly have committed. In many cases it developed that they signed confessions because they were not allowed to sleep. They were not subjected to physical violence, but by various devices and means they were denied sleep. The agony of the denial of sleep is a torture which surpasses almost any type of physical manhandling. It has been proved scientifically that the time comes when the victim who is denied sleep will sign any paper, confess to any murder or a hundred of them, if only he may close his eyes in dead relief so that the thousands of battering rams at every pore of consciousness may cease their maddening blows.

The Majority is not unsympathetic to victims of sleep pirates and quotes with approval what the celebrated Justice KENT said, namely: "The doctrine of compelling a jury to unanimity by the pains of hunger and fatigue, so that the verdict in fact be founded not on temperate discussion and clear conviction, but on strength of body, is a monstrous doctrine that does not stand with conscience, but is altogether repugnant to a sense of humanity and justice." (*People v. Olcott*, 2 Johns. Cas. 301). The Majority only says that there is no proof in this case that any juror was coerced into the verdict because of lack of repose. But the facts of Nature are as much a part of a Court record as the stenographic transcript. Nature writes with an accuracy and an inerasability that would shame the most faithful stylograph or stenotype. And when it is known that a jury is deadlocked at 5 a.m., after deliberating all night, and have not only had no sleep but no accommodations in which to rest comfortably,

and a Judge tells them they had better come to a unanimous conclusion pretty soon, the verdict becomes suspect when that verdict does come in pretty soon.

The Majority cites the case of *Commonwealth v. Tenbroeck*, 265 Pa. 251, which supports my position rather than the Majority's. In that case the Judge said to the Jury: " 'If some one of you should become physically unable to remain, the situation would be different, but as long as you are physically able to remain, it is your duty to undertake to agree.' " If, indeed, in the case at bar, the Judge had intimated to the jury in any way that he would allow them to sleep if they needed sleep, and he would see that they got the accommodations to sleep, the situation would have been considerably different. But the Judge failed to tell the jury that he would give them the opportunity to sleep, if they wanted to sleep, and, failing to do this, he ignored Justice who, herself, lay down on the couch of weariness and drifted off into the land of Nod where thought is a vagrant zephyr, deliberation a floating vapor, and decision uncontrolled, irresponsible, and often bizarre.

---

DISSENTING OPINION BY MR. JUSTICE MCBRIDE:

I cannot agree that the opinion of the Court, or any of the observations contained therein, were either artless or almost naive. Nevertheless, in all other respects I join the reasoning and the conclusion in the dissenting opinion of Justice MUSMANNO. I need add only a few words on my own.

I have examined the record in *Commonwealth v. Tenbroeck*, 265 Pa. 251, 108 Atl. 635, cited in the majority opinion, and was shocked to find that at the time it was written it would support the present majority opinion. Indeed, the coercion there was infinitely worse than the coercion here. It must be pointed out, however, that (1) this Court was con-

vinced that the verdict should have been murder of the first degree rather than second degree, which the jury found; (2) the case was decided 41 years ago when accommodations for jurors (particularly for females) were far less civilized than they are now; and (3) during the trial the jurors had been permitted to separate, no hotel accommodations having been provided for them. It seems to me that the legislature has, in effect, invalidated the *Tenbroeck* decision.

As recently as the Act of August 9, 1955, P. L. 323, §2336, which is applicable, inter alia, to Dauphin County, cited in the majority opinion, shows the legislative intent that women jurors, on a jury which is unable to agree on a verdict "upon the day in which the case was placed in their hands", shall for their comfort and convenience have rooms "equipped with mirrors, toilets, beds and other conveniences." This jury was composed of 10 women and 2 men. Conceding that the jurors did not specifically ask for what the legislature required to be available for them "upon order of the court", it is, in any event, clear that counsel for defendant, at 3 a.m., specifically requested that the jury's deliberations be interrupted to give them rest. The question therefore is whether it was an abuse of discretion for the court, in the present case, to fail or refuse to do what it had power to do. And it is not without significance that this happened in the Capitol of the Commonwealth, not in some obscure place where criminal trials are rare.

I believe that the decision whether the court below abused its discretion is akin to the principles that govern in applying the doctrine of harmless error. It is just as necessary that we do not find an abuse of discretion where the decision of the court below was reasonable, even though we disagree with it, as that we should not reverse a lower court for error where we are satisfied that it was harmless. The application of

either of these principles, however, is not a ritualistic or dogmatic formula which necessarily depends upon whether the case, apart from the alleged abuse or error, warrants conviction.

In *Commonwealth v. Blose,* 160 Pa. Superior Ct. 165, 50 A. 2d 742, the Superior Court adopted the view as to harmless error stated by the Supreme Court of the United States in *Kotteakos v. United States,* 328 U. S. 750, 66 S. Ct. 1239, 1248, where it was said: "If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand."

Of course, one can never tell with certainty whether compelling the jury to continue its deliberations, as the court below did, was prejudicial to the defendant or favorable to her. In this case, however, although I am convinced that the evidence could possibly have warranted a finding greater than voluntary manslaughter, it does not seem to me that such a verdict would have been either likely or just. The real issue was not between murder and manslaughter but between manslaughter and Not Guilty. The situation is much different than in *Tenbroeck,* supra. In this case, after a review of the record, I am left with the unrelievable impression that the jury was coerced by fatigue and that this coercion did prejudice defendant.