403 A.2d 1329

**COMMONWEALTH of Pennsylvania**

v.

**Bill T. LUTHER and Sylvia C. Luther, Consolidated Appeals, Appellants.**

Superior Court of Pennsylvania.

Argued Dec. 6, 1978.

Decided May 18, 1979.

Petition for Allowance of Appeal Denied Sept. 19, 1979.

A. Stephen Cohen, Sunbury, for appellants.

R. Michael Kaar, Assistant District Attorney, Milton, on brief, for Commonwealth, appellee.

Before CERCONE, HESTER and HOFFMAN, JJ.

HESTER, Judge:

Appellants Bill T. Luther and his wife Sylvia were convicted by a jury of violating Section 481(a) of the Public Welfare Code, Act of June 13, 1967, P.L. 31, No. 21, Act 4, § 481, 62 P.S. § 481(a).[1]. Following denial of post-trial

---

1. This statute, proscribing what is commonly known as "Welfare Fraud", provides:

    (a) Any person who, either prior to, or at the time of, or subsequent to the application for assistance, by means of a wilfully false statement of misrepresentation, or by impersonation or other fraudulent means, secures, or attempts to secure, or aids or abets any person in securing assistance under this article shall be guilty of a misdemeanor, and, upon conviction thereof, shall be sentenced to pay a fine not exceeding one thousand dollars ($1,000), or to undergo imprisonment not exceeding one year, or both, and also shall be sentenced to make restitution of any moneys he has received by reason of any such statement, misrepresentation, impersonation, or fraudulent means.

motions, both appellants were placed on one year probation and ordered to make restitution to the Commonwealth in the amount of $1,143.00. These consolidated appeals followed. We affirm the judgments of sentence.

■ Appellants first contend that the evidence was insufficient to sustain the verdicts of guilty. In evaluating the sufficiency of the evidence, the test is whether viewing the entire record in the light most favorable to the Commonwealth and drawing all reasonable inferences favorable to the Commonwealth, there is sufficient evidence to enable the trier of fact to find every element of the crime beyond a reasonable doubt. *Commonwealth v. Smith*, 484 Pa. 71, 398 A.2d 948 (1979); *Commonwealth v. Santiago*, 476 Pa. 340, 382 A.2d 1200 (1978); *Commonwealth v. Kichline*, 468 Pa. 265, 361 A.2d 282 (1976). Moreover, the trier of fact, while passing upon the credibility of witnesses and the weight to be afforded the evidence produced, is free to believe all, part, or none of the evidence. *Smith*, supra; *Commonwealth v. Hinchcliffe*, 479 Pa. 551, 388 A.2d 1068 (1978). So viewed, the instant record reveals the following:

On August 6, 1974, the Luthers walked into the Shamokin office of the Department of Welfare, Northumberland County, Board of Assistance, seeking a determination of their eligibility for public assistance. There, they were interviewed by Gordon Phillips, an Income Maintenance worker, whose task it was to conduct the initial interview and determine eligibility. Finding that the Luthers had no income, Phillips granted their application. He then advised the Luthers of their "responsibility to report to our office any circumstances such as income, change of address, or someone leaving home, to report to our office that is their obligation and let us know . . . especially income." N.T. 23. In addition, Mr. Luther was instructed to register with the State Employment Bureau.

Minor amendments were added in 1976, Act of July 9, 1976, P.L. 993, No. 202, § 8 and the statute, as amended, now appears at 62 P.S. § 481(a).

The case was then assigned within the Department's Shamokin office to a "continued worker", one Judith Zabawsky, whose job it was to keep abreast of the file as an active case. From September, 1974 to mid-January, 1975, Mrs. Zabawsky was visited "four or five times" by Mr. Luther because of his apparent reluctance to comply with departmental directives that he re-register with the employment bureau. During these visits, Mr. Luther at no time advised Mrs. Zabawsky that he or his wife was employed. Also during this time period, the Luthers were receiving their bi-weekly welfare checks, payable to Mr. Luther's order, each in the amount of $127.00.

On September 25, 1974, appellant Sylvia Luther began working in Sunbury for Attorney Stephen Cohen as his secretary. During her lunch breaks, she often ate at a restaurant frequented by several Welfare Department employees, who observed her coming and going from Attorney Cohen's offices. Near the end of January, 1975, one of these employees asked Mr. Luther if his wife was working for Mr. Cohen, to which Mr. Luther replied, "Yes, she was." N.T. 36. When apprised of this conversation, Mrs. Zabawsky immediately phoned Mrs. Luther at her job, whereupon Mrs. Luther admitted being in Mr. Cohen's employ for "a couple of months", but assumed the Department knew about it since she had been seen frequently in the restaurant. Mrs. Zabawsky's efforts to gain more specific information as to the amount of Mrs. Luther's earnings, so that an overpayment may be calculated, were unsuccessful, and the assistance checks were terminated the first week of February, 1975. Overpayment of $1,143.00 was premised on a series of nine checks, issued and cashed during the period of Mrs. Luther's employment. These funds were not returned to the Department.

The gravamen of appellant's contention is that the Commonwealth failed to establish the Luthers criminal intent to provide "wilfully false statement[s] of misrepresentation . . . or other fraudulent means". Section 481(a). We are of the opinion, however, there was a wealth of evidence

on the intent issue upon which the jury could properly structure its guilty verdicts. From the initial interview with Gordon Phillips, appellants were fully and repeatedly advised of their affirmative obligation to report any change in their income to the department. Neither appellant had any question or exhibited any misunderstanding as to the nature and scope of these responsibilities. N.T. 24. During the "four or five" personal encounters between Mr. Luther and Mrs. Zabawsky in the latter part of 1974, Mr. Luther was "always" advised that "it is his responsibility to report any and all changes after Mr. Phillips explained the income, address, someone moving in, someone moving out . . . " N.T. 43, 44. On the back of each of the nine checks at issue, just above Bill Luther's signature,[2] the following printed matter appears:

By endorsing this check I certify that I have notified my County Board of Assistance of all changes in the facts as stated in my application for assistance and that neither I nor any member of my family has any earnings from employment or other resources which would affect the eligibility of myself or my family which I have not reported to said Board. I know that I can be penalized by fine or imprisonment, or both, for any false statement. Commonwealth's Exhibit No. 2.

Testimony offered by the defense further buttresses the jury's verdicts. In February, 1974, Mr. Luther had applied for and received public assistance for a short time. When he obtained employment he called the department "the first day I went to work and told them that I was working". N.T. 73. His assistance was thereafter discontinued. The jury could thus infer Mr. Luther was well aware of his reporting obligations when he applied again in August that same year, and yet he failed to report his wife's income. The jury could further conclude the Luthers knew precisely how and where to report any extra income. Both appellants admitted that they were in fact advised by Department

**2.** There was no dispute that Mr. Luther did indeed endorse each of these checks. N.T. 84.

employees of their reporting responsibilities and were well aware that a change in employment status could effect their eligibility. N.T. 86, 89, 93. They testified to a letter they sent to the Northumberland County Board of Assistance in early October, 1975, advising the Department of Mrs. Luther's new job. Defendant's Exhibit No. 1. Department employees denied any such notice was ever received from the Luthers. The jury was free to accept the Commonwealth's version of facts suggesting appellants did not inform the Department of the change in their employment status. *Hinchcliffe*, supra.

Appellants argue that the Shamokin Welfare Office did not set forth for appellants a specific "plan for reporting" to the office a change in income status. Various administrative guidelines are cited in appellants' brief which require the Welfare worker to enter a "plan for reporting" in the case record. Pa.Code, Title 55, § 255.81(5) (Apr. 78). From this record, it appears this issue and these regulations were not argued to the court at any time during the proceedings below. *Commonwealth v. Clair*, 458 Pa. 418, 326 A.2d 272 (1974). Further, this contention was not included in post-trial motion, which were of the "boiler-plate" variety. *Commonwealth v. Austin*, 484 Pa. 56, 398 A.2d 941 (1979); *Commonwealth v. Blair*, 460 Pa. 31, 331 A.2d 213 (1975). Quite apart from the waiver issue, however, appellants' averments are wide of the mark for the issue before the jury was not whether the Department had complied with alleged procedural guidelines, but rather whether the Luthers were aware of their responsibilities and wilfully failed to report their change in circumstances. Taking into account appellants' admitted awareness of reporting requirements, repeated admonitions from Department employees to give notice of changed circumstances, the check endorsements, appellants' familiarity with the location and personnel of their County Board of Assistance, as well as the Luthers' previous experience with Department regulations, there was a wealth of evidence from which the jury could find the Luthers knew how, when, and where to supply the

Welfare Office with required information. We will not upset that finding.[3]

█ Appellants finally contend that the trial judge should have recused himself. *Commonwealth v. Parrish*, 250 Pa.Super. 176, 378 A.2d 884 (1977). This issue was not raised in post-trial motions and is therefor waived. *Austin*, supra; *Blair*, supra.

Judgments of sentence affirmed.

HOFFMAN, J., files a dissenting statement.

HOFFMAN, Judge, dissenting:

I dissent.

Appellants contend that there was insufficient evidence of criminal intent to sustain guilty verdicts on charges of welfare fraud. I agree and, accordingly, would vacate the judgments of sentence.

Criminal complaints charging appellant with violating § 481(a) of the Public Welfare Code [1] were filed on January

---

**3.** Appellants also argue that the lower court erred in not sustaining their demurrer at the close of the Commonwealth's case. Since, however, appellants did not rest following the adverse ruling, N.T. 70–1, but elected to put in a defense, the correctness of the ruling on the demurrer is no longer an available issue. *Commonwealth v. Moore*, 398 Pa. 198, 157 A.2d 65 (1959). We will treat the question as if properly framed, namely, whether the trial court erred in refusing appellants motion for arrest of judgment. *Commonwealth v. Warren*, 475 Pa. 31, 379 A.2d 561 (1977); *Commonwealth v. Ilgenfritz*, 466 Pa. 345, 353 A.2d 387 (1976). "In order for the trial court to properly grant a criminal defendant's motion in arrest of judgment on the ground of insufficient evidence, 'it must be determined that accepting all of the evidence and all reasonable inferences therefrom, upon which if believed [the verdict could properly have been based] it would be nonetheless insufficient in law to find beyond a reasonable doubt that the [defendant] is guilty of the crime charged' ". *Commonwealth v. Meadows*, 471 Pa. 201, 369 A.2d 1266, 1268 (1977) quoting *Commonwealth v. Blevins*, 453 Pa. 481, 483, 309 A.2d 421, 422 (1973); cf. *Commonwealth v. Ponder*, 260 Pa.Super. 225, 393 A.2d 1235 (1978). This standard is substantially similar to that which we have already applied to the facts herein and hence we conclude the court did not err in refusing to arrest judgment.

1. Public Welfare Code, Act of June 13, 1967, P.L. 31, No. 21, art. 4, § 481; 62 P.S. § 481(a).

21, 1976. On September 20, 1976, after a consolidated trial, a jury found them guilty of the charges. On March 6, 1978, after denying post-verdict motions, the lower court suspended sentence, placed each appellant on one year probation, and ordered each to pay $1143.00 as restitution within 10 months. This appeal followed.

Regarded in the light most favorable to the Commonwealth, the evidence presented at appellant's jury trial may be summarized as follows:

In early August 1974, appellants applied for assistance.[2] Soon thereafter they began to receive biweekly assistance checks in the amount of $127. Both appellants admitted that they knew they had an obligation to report any change in income to the Welfare Department.[3] However, the Commonwealth presented no evidence of any specific reporting procedures with which the Luthers had to comply. The Commonwealth's principal witness, Judith Zabawsky, an income maintenance worker, admitted that there was no definite format describing either when, how, or whom recipients should inform concerning their employment.[4] Ms. Zabawski testified that recipients often informed her by letter or a telephone call.

On September 25, 1974, Mrs. Luther began to work for an attorney as his secretary. The attorney's office was located near a restaurant frequented at lunchtime by several Welfare Department employees. The employees regularly observed Mrs. Luther entering and leaving the office; Mrs. Luther saw them and recognized them as employees of the Welfare Department. Towards the end of January 1975, Mr. Luther told those same employees that his wife was

2. *See* Public Welfare Code, *supra*; 62 P.S. § 402 for the definition of "assistance."

3. *See* Public Welfare Code, *supra*; 62 P.S. § 432.2(d). The Commonwealth does not claim that the Luthers' application for assistance contained any misstatements.

4. Redetermination of eligibility "shall not be less frequent than every six months." Public Welfare Code, *supra*; 62 P.S. § 432.2(c). The Commonwealth presented no evidence concerning the frequency with which the Luthers' eligibility was reviewed.

working for the attorney. That same day Zabawsky telephoned Mrs. Luther at work and asked her whether she was employed. Mrs. Luther told Zabawsky that she was employed and that she had not reported her employment to Zabawsky because she had assumed that the Welfare Department knew from its own employees that she was working.[5] Zabawsky requested Mrs. Luther's pay stubs or, if she had no stubs, a wage statement from her employer in order to verify her employment and to compute any adjustments in the assistance grant. Zabawsky testified that the Luthers at no time denied that Mrs. Luther was employed. She further testified that if Mrs. Luther "would have sent . . in her pay stubs, she would still have been eligible for financial assistance at a reduced rate. [She was] not allowed to discontinue anyone without verification of some sort." Zabawsky sent several requests to Mrs. Luther's employer for wage information, but he did not respond. Zabawsky then sent a notice to the Luthers that their assistance would be discontinued in 15 days due to overpayment; Zabawsky estimated the amount of overpayment from October 1974, using information Mrs. Luther had given her. The Luthers received assistance up to February 26, 1975, at which point assistance was discontinued.

On September 13, 1975, Mrs. Luther's employer informed the Bureau of Claims Settlement of the Welfare Department that he had employed Mrs. Luther since September 25, 1974 at $100 per week. From September 25, 1974 to February 26, 1975, the date assistance was discontinued, Mr. Luther received and endorsed[6] nine financial assistance

5. In fact, Zabawsky testified that at least since mid-December 1974 the Welfare Office had had a "suspicion" that Mrs. Luther was working, based upon the observations of the Department employees. The Welfare Department did not approach the Luthers about this until January 1975.

6. On the back of each check was the following:
"By endorsing this check, I certify that I have notified my County Board of Assistance of all changes in the facts as stated in my application for Assistance, and that neither I nor any member of my family has any earnings from employments or other resources which would affect the eligibility of myself or my family which I have not

checks totalling $1143.00, which is the amount of overpayment claimed by the Welfare Department.

Section 481(a) of the Public Welfare Code provides:

"Any person who, either prior to, or at the time of, or subsequent to the application for assistance, by means of a wilfully false statement of misrepresentation, or by impersonation or other fraudulent means, secures, or attempts to secure, or aids or abets any person in securing assistance, or Federal food stamps, under this article shall be guilty of a misdemeanor, and, upon conviction thereof, shall be sentenced to pay a fine not exceeding one thousand dollars ($1,000), or to undergo imprisonment not exceeding one year, or both, and also shall be sentenced to make restitution of any moneys he has received by reason of any such false statement, misrepresentation, impersonation, or fraudulent means."

In the absence of a statutory definition of terms, we must construe them according to their common and approved usage, keeping in mind, however, that because the provision is penal in nature, we must construe it strictly. Statutory Construction Act of 1972, Act of Nov. 25, 1970, No. 230, added Dec. 6, 1972, No. 290, § 3; 1 Pa.C.S.A. §§ 1903(a) and 1928(b)(1). "Willful" means "done deliberately: not accidental or without purpose: INTENTIONAL", and "fraud" means "an intentional misrepresentation, concealment, or nondisclosure for the purpose of inducing another in reliance upon it to part with some valuable thing belonging to him. . . ." Webster's Third International Dictionary, 2617 (1967). *See* 55 Pennsylvania Code § 255.3(b).[7] *Compare* 18 Pa.C.S.A. § 302(b)(1) and (2).

reported to said Board. I know that I can be penalized by fine or imprisonment, or both, for any false statement."

7. 55 Pennsylvania Code § 255.3(b) provides as follows:

"(b) *Criteria for distinguishing between suspected fraud and nonfraud.* The determining factor in distinguishing between fraud and nonfraud [with respect to overpayments] will be the intent of the client. Intent will be established by examining and evaluating pertinent objective facts, including the following:

In the instant case, I do not believe the Commonwealth's evidence supports a finding that the Luthers secured assist-

"(1) *Actions and attitudes of the client.* The answers to the following questions will be employed in determining the actions and attitudes of the client:

"(i) Did the client deny the fact that caused the overpayment?

"(ii) Did the client provide information that was misleading or incorrect?

"(iii) Were any of the actions of the client directed to concealing information? For example, did he deface or alter documents or arrange appointments with the caseworker so as to conceal other activities?

"(iv) What was the reaction of the client to the fact of the overpayment? What did he see as the cause?

"(2) *Nature of the overpayment.* The answers to the following questions will be employed in determining the nature of the overpayment:

"(i) Was the overpayment in such an amount that the client could not have failed to realize that his assistance payment was incorrect?

"(ii) Did the period of overpayment extend over such a period of time that the client had repeated opportunities to report?

"(iii) Were there previous overpayments for related reasons?

"(3) *The ability of the client to comprehend requirements.* The answers to the following questions will be employed in determining the ability of the client to comprehend requirements:

"(i) Are there any physical disabilities, such as advanced age, defective hearing or vision, or illness which affect the ability of the client to understand the requirements and his responsibilities in connection with them?

"(ii) Are there any mental limitations, such as emotional or psychiatric disturbances, or mental retardation which affect the client's understanding of what is expected of him?

"(iii) Does the client have any social handicaps, such as illiteracy, language barriers, or lack of education which affect his comprehension of requirements?

"(iv) Were there social factors at the time of the overpayment such as death, accident, serious illness, desertion, and the like that so involved the client that comprehension of the importance of meeting reporting requirements was affected?

"(4) *Quality of worker's job with the client.* The answers to the following questions will be employed in determining the quality of the worker's job with the client:

"(i) Does the case record indicate that the pertinent regulations were explained in terms suited to the capacity of the client?

"(ii) Were appropriate reporting plans worked out with the client?

"(iii) Were redeterminations of eligibility made as frequently as appropriate to the situation?

"(iv) Has the method of working with the client been such as to demonstrate to him the importance of reporting changes in his circumstances? Has the capacity of the client for carrying responsibility been evaluated realistically?"

ance "by means of a willfully false statement of misrepresentation . . . or other fraudulent means." 62 P.S. § 481(a). The facts and circumstances of the case adduced at trial show that by January 1975 the Luthers had expressly informed the Welfare Department fully and accurately of the terms of Mrs. Luther's employment. In fact, the Welfare Department based its original estimate of the amount of overpayment upon the information which Mrs. Luther gave. Concerning the Luther's delay from September 25, 1974 to January 1975 in reporting Mrs. Luther's employment, I would note that (1) no specific procedures existed for reporting employment and (2) all the testimony indicated that the Luthers never denied, misstated or attempted to conceal Mrs. Luther's employment, or otherwise exhibited secretive or evasive behavior from which a willful intent to deceive may be inferred. From the moment the Welfare Department first contacted them in January 1975, the Luthers cooperated fully. Under these circumstances, therefore, I would conclude that the evidence was insufficient to support appellants' convictions under § 481(a).[8]

8. I note specifically that the Public Welfare Code, *supra* provides both administrative and civil procedures for recoupment of overpayments. Public Welfare Code, *supra*; 62 P.S. § 432.16.