J-S40006-16

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| MAX C. STINE | |
| Appellant | No. 2882 EDA 2014 |

Appeal from the Judgment of Sentence September 18, 2014
In the Court of Common Pleas of Montgomery County
Criminal Division at No(s): CP-46-CR-0005987-2013

BEFORE:  BOWES, MUNDY AND MUSMANNO, JJ.

MEMORANDUM BY BOWES, J.:                          **FILED JULY 21, 2016**

Max Stine appeals from the September 18, 2014 judgment of sentence imposed following his conviction of first-degree murder, two counts of aggravated assault, two counts of recklessly endangering another person, and possessing an instrument of crime.  We affirm.

The present convictions arise from the shooting death of Jesus Mendoza.  The Commonwealth established the following facts.  At approximately 3:15 a.m. on July 11, 2011, Corporal Michael Bishop of the Norristown Borough Police Department, who had been responding to another incident, heard automatic gunfire from a nearby alley.  He proceeded to that location and noticed Mr. Mendoza slumped against a building in Haws Alley.  The victim was unresponsive, bleeding, and clutching a knife in his hand.

N.T., 6/9/14, at 52-58. The coroner determined Mr. Mendoza died of multiple gunshot wounds. N.T., 6/10/14, at 26. Twenty shell casings recovered from the scene were determined to be an "AK type of ammunition" fired from the same firearm. N.T., 6/12/14, at 109-113.

Prior to the shooting, Appellant had been partying in Paul Hernandez's apartment, which was near Haws Alley. N.T., 6/10/11, at 106, 112. At some point in the evening, Hernandez observed two males and a female fighting on a nearby street. *Id*. at 113. Hernandez became involved in an altercation with another group of men. Hernandez and these men threw rocks at each other. *Id*. at 164. Eventually, the female and one of the males walked away together. *Id*. at 115. Hernandez told Appellant about the incident, and Appellant went outside and retrieved an AK-47 weapon from his vehicle.

Later that evening, Hernandez again saw Mr. Mendoza, the victim, and thought that Mr. Mendoza was one of the men who had been throwing rocks. *Id*. at 169. Hernandez went outside to confront him. *Id*. at 118. As Hernandez approached, the victim produced a knife and Hernandez did the same. *Id*. at 119. Hernandez heard a woman screaming not to fight. Before the men could physically engage, Hernandez heard shots and saw Mr. Mendoza fall to the ground. Hernandez turned around and saw Appellant holding the AK-47. *Id*. at 120. Appellant fired several more shots, and Hernandez helped Appellant dispose of the gun's case and some bullets.

- 2 -

The Commonwealth called as witnesses the three persons involved in the fight observed by Hernandez. Jennifer Sheridan testified that she was walking with a man named Danny. *Id*. at 69. She and Danny encountered her ex-husband, Omar Trujillo. *Id*. at 64-65. Omar and Danny fought each other. *Id*. at 72; N.T., 6/12/14, at 58. Mr. Mendoza, who was friends with Ms. Sheridan and standing nearby, agreed to escort her home. The victim stuck a knife in his sock and walked away with Ms. Sheridan. N.T., 6/10/11 at 75-76. After seeing Ms. Sheridan home, Mr. Mendoza walked back past Hernandez's apartment, whereupon Hernandez confronted him. Ms. Sheridan did not witness the shooting.

The Commonwealth additionally presented the testimony of Maria Alvarez, the woman Hernandez heard screaming. N.T., 6/12/14, at 11. Alvarez was accompanied by Jose Ramirez. *Id*. at 5. Alvarez and Ramirez, who fled as the fight started, suffered injuries from stray gunfire.[1] H.R., a juvenile who was present in Hernandez's apartment, confirmed that Appellant retrieved the AK-47, and he also heard Appellant say, "Let's scare them" when Appellant saw Ms. Sheridan, Omar, and Danny. N.T., 6/11/14, at 24-25. Finally, H.R. testified that Appellant fired the gun at Mr. Mendoza. *Id*. at 31.

---

[1]    These injuries formed the basis for the aggravated assault charges.

The jury convicted Appellant of the aforementioned crimes. On September 18, 2015, Appellant received the mandatory sentence of life imprisonment. A timely notice of appeal followed.

The trial court issued orders to file a Pa.R.A.P. 1925(a) statement of matters complained of on appeal. Thereafter, a series of attorney withdrawals and appearances occurred, and the appointed attorneys ignored the trial court's orders to file a statement. The trial court experienced great difficulty in attempting to satisfy its obligations to timely author an opinion and transmit the record to this Court, while simultaneously respecting Appellant's appellate rights. The trial court grappled with the competing principles of deeming issues waived for failure to timely file a statement and our precedents interpreting Rule 1925(c)(3), which permits us to remand for filing of a Statement *nunc pro tunc* where counsel ineffectively failed to file a statement. ***See e.g. Commonwealth v. Thompson***, 39 A.3d 335, 341, n.11 (Pa.Super. 2012) (directing trial court to address an untimely statement without direction for remand to avoid unnecessary delay). These procedural complexities necessitated the filing of three Pa.R.A.P. 1925(b) opinions.

The trial court cited the concurring opinion in ***Commonwealth v. Burton***, 973 A.2d 428, 437 (Pa.Super. 2009) (*en banc*), wherein Judge Stevens expressed concern that Rule 1925(c)(3) "gives defense criminal attorneys the power to unilaterally extend time requirements in filing Rule

- 4 -

1925(b) statements . . . there is now no consequence when a criminal defense attorney files a late statement." Trial Court Opinion, 2/13/15, at 12 (citing **Burton**, **supra**). The third opinion repeats this concern. Trial Court Opinion, 11/24/15, at 3-4.[2] The third opinion addressed the merits of the issues and Appellant raises the same two issues for our review.

> I. Did the court abuse its discretion by charging the jury late on a Friday afternoon and advising the jury they would deliberate until 9:30 that night before adjourning until Monday morning, thereby improperly rushing the jury to judgment which, in fact, the jury brought back at 9:25 p.m.?
>
> II. Did the District Attorney improperly argue to the jury that the Defendant could not legally own an AK-47 rifle thus prejudicing the jury?

Appellant's brief at 3.

Appellant's first issue avers that the trial court abused its discretion in permitting the jury to deliberate until 9:30 p.m. The facts surrounding the jury charge and deliberation are as follows. The jury was brought in for instructions at 12:55 p.m. on Friday. However, the presiding judge, the Honorable Joseph Smyth, felt ill and excused himself at 1:30 p.m. **Id**. at 145. One hour later, the Honorable Steven O'Neill appeared, stating that Judge Smyth had been taken to the hospital. **Id**. at 146. The parties discussed what action to take, including the possibility of discharging the

---

[2]   We appreciate the trial court's cogent and thorough analysis, and recognize the trial court's frustration in the difficulties it encountered in attempting to receive the counseled Rule 1925(a) statement.

jury for the weekend. *Id*. at 147. Judge O'Neill brought the jury back in to inform them what had happened to Judge Smyth, and explained that he would recharge the jury instead of trying to simply fill in any gaps left by the earlier instructions. He stated he needed to review the materials and discuss them with the attorneys, which would cause further delay, and told the jury the following:

> Now, one of the options that was discussed as to whether this jury would return Monday, simply return Monday and receive the Charge of the Court, hopefully Judge Smyth's Charge of the Court or at least the Charge of the Court and commence their deliberations at an earlier hour. That is not what was planned by anybody today. We recognize that including Judge Smyth and the counsel in this case.
>
> However, we did discuss as counsel – with counsel as to whether that was an option. Now, I believe it was never discussed when the *voir dire* in this case was [sic] could the case go over until Monday, if it did go over into Monday. I generally throw a cautious request or a question when I do *voir dire*, but I don't know whether it was done in this case. So I don't know if people are available. . . .
>
> So I am assuming, unless I hear from the jury's consensus – and I will send you back as to whether that is what you would choose to come back Monday and have the charge start then. If not, we will do it today.

*Id*. at 154-56. The jury was then dismissed, with the judge stating the current plan was to reconvene and charge at 3:00 p.m. *Id*. at 158. At 3:10 p.m., the jury was brought back. Judge O'Neill noted that with the late hour there was a concern about whether everyone could come back on Monday if a verdict was not reached:

General practice, jurors deliberate until they reach a verdict, whatever that takes. There's no hour set. There's no time. Now, in this case, it becomes clear to me that with a late hour, that this jury unless there's something and, again, I'm only going to ask you to raise a hand, if it is almost impossible for you to come back Monday, then I will have to individually discuss this with you to determine how we will handle it.

But, again, if this jury went home tonight with a cautionary instruction which I am assuming Judge Smyth gave you because you don't have this case yet, you don't have the Charge of this Court. And then you would return Monday, that's quite normal what we do, but the only thing I understand in the case it wasn't part of the *voir dire* as to it going over into Monday, and I think we as judges sometimes assume that jurors just get that. They don't often.

Is there anybody on this jury and, again, I only seek a raise of hand that absolutely, positively cannot return Monday for the Charge of the Court the deliberation for a verdict[?]

*Id*. at 160-61. One juror raised his hand, and both attorneys consented to excusing him for cause. Upon the jury's request, and with consent of counsel, the judge spoke to the jury off the record. *Id*. at 167. Judge O'Neill went back on the record to state what happened during that conversation:

This jury wants the charge tonight. That's what we are going to do. They were not clear. They said they want you to know that we would take the charge.

They wanted to know how long we deliberate. I said, generally, probably until maybe 9:30; and if not, we will bring you back. Let me just take that clear to them, if they did not have a verdict, I would bring them back. That's it.

*Id*. Appellant objected, stating the judge was attempting to force a verdict and asked to charge on Monday. At 4:00 p.m., the jury entered the

courtroom for instructions. Judge O'Neill once again stated on the record that he spoke to the jurors "at which time I was advised by that jury that it is their preference to continue on with the Charge in this case." *Id*. at 179.

The charging concluded at 5:15 p.m. *Id*. at 248. At 9:00 p.m., the court answered the jury's request for a recharge on first and third-degree murder. *Id*. at 255. Judge O'Neill stated, "I intend to abide by your request that you want – the deliberations not to go past 9:30. So done. If you can reach a verdict, you reach a verdict." *Id*. at 256. At 9:10 p.m., the jury was sent back for and returned a verdict at 9:25 p.m. *Id*. at 263.

With the foregoing facts in mind, we now turn to the application of the law. The extent of time that a jury is kept for deliberation is a matter entrusted to the trial judge, and we review challenges to those decisions under an abuse of discretion standard. *Commonwealth v. Chester*, 587 A.2d 1367, 1380 (Pa. 1991).

Appellant argues this discretion was abused in that the verdict was a product of coercion or an overworked or fatigued jury. Appellant's brief at 10. He asks us to consider the charges at issue, the complexity of the issues, the amount of testimony to consider, the length of the trial, the solemnity of the proceedings, and indications from the jury on the possibility of reaching a verdict. *Id*.

While these factors play a role in the abuse of discretion analysis as applied to jury deliberations, we note that the cases discussing these

matters generally do so only where the jury is ordered to continue deliberating after indicating an inability to reach a verdict. *See e.g.* *Commonwealth v. Smith*, 131 A.3d 467, 475 (Pa. 2015); *Commonwealth v. Marion*, 981 A.2d 230, 235 (Pa.Super. 2009); *Commonwealth v. Greer,* 951 A.2d 346, 354 (Pa. 2008); *Commonwealth v. Moore*, 937 A.2d 1062, 1077 (Pa. 2007). Thus, the cited factors are viewed with an eye towards determining whether or not the court erred in forcing **further** deliberations. "Each case differs in the complexity of the issues presented, the seriousness of the charges, the number of charges to be considered, the amount of testimony to be digested and reviewed . . . [to determine whether to] accept the jury's conclusion that they were hopelessly deadlocked." *Chester*, *supra* (citing *Commonwealth v. Monte*, 329 A.2d 836, 841 (Pa. 1974)).

That the harm to be guarded against is forcing a jury to reach a verdict after deadlock is apparent when considering that *Chester* cited *Commonwealth v. Moore*, 157 A.2d 65 (Pa. 1959) for the proposition that a verdict brought about by judicial coercion is a legal nullity. *Moore* stated:

> The doctrine of compelling a jury to unanimity by the pains of hunger and fatigue, so that the verdict in fact be founded not on temperate discussion and clear conviction, but on strength of body, is a monstrous doctrine that does not stand with conscience, but is altogether repugnant to a sense of humanity and justice. A verdict brought about by judicial coercion is a nullity in the eyes of the law. If the instant verdict were brought about by any compulsion or if there was anything of record to indicate that the instant verdict was reached because of the

> jurors' desire for rest and sleep or fatigue, we would have no hesitancy in setting such verdict aside. However the instant record does not disclose such motivation for this verdict.

*Id*. at 70 (citation and quotation marks omitted).

Herein, there is no concern of judicial coercion since the jury was not impelled to keep deliberating after becoming deadlocked. The members did not indicate any inability to reach a verdict and the jury was not ordered to do anything beyond carrying out the duty to carefully deliberate. In fact, the record indicates the jury wished to receive the case on Friday and stay through the evening. The trial court obviously considered the jury's ability to cogently decide the matter when it observed that "all jurors are hale and hearty and prepared to deliberate." N.T., 6/13/14, at 157. Only one juror indicated he was unavailable for deliberation on Monday, and he was excused. Thus, it is clear the jurors were willing and ready to return on Monday if needed. We find no abuse of discretion in accommodating the jury's request to decide the case late on a Friday.

In this regard, we note that in **Commonwealth v. Hetzel**, 822 A.2d 747, 767 (Pa.Super. 2003), the appellant claimed she was denied a fair trial because the jury was permitted to deliberate past midnight. We attached significance to the jury's role in requesting to keep deliberating:

> Hetzel next claims that she was denied a fair trial when the trial court permitted jury deliberations to extend until just past midnight. She concedes that the court gave the jury the choice of continuing deliberations or going home. . . .

- 10 -

> In reviewing this claim we apply an abuse of discretion standard to determine whether the verdict was the product of coercion of an overworked or fatigued jury. . .we find no abuse of discretion. The jurors were given the opportunity to depart for the evening and chose not to do so. The court acted properly.

*Id*. at 767 (footnotes and citations omitted). The jury herein had the similar option of ceasing deliberations by simply going home for the weekend and resuming on Monday.[3]

We therefore discern Appellant's argument to be nothing more than an attack on the fact the jury reached a verdict in four hours. Appellant does not cite any case for this argument, and we recently rejected a similar argument. ***Commonwealth v. Ferguson***, 107 A.3d 206, 212 (Pa.Super. 2015) (rejecting claim that Appellant was denied a fair trial due to jury reaching a verdict in one hour and six minutes). There is no basis to conclude the jury rushed to a verdict.

---

[3] Appellant's argument to the contrary is based on sheer speculation. "It appears abundantly clear that . . . at least one (1) or more members of the jury compromised their opinion so that the jury would not have to return Monday morning." Appellant's brief at 11-12. This argument additionally ignores the fact the sole juror who indicated an inability to return Monday was excused.

Moreover, if the jury were truly concerned with ignoring instructions and simply going home, as Appellant suggests, it could have returned a verdict earlier in the evening. That the jury had a question about the degrees of homicide, and came to a verdict shortly thereafter, demonstrates the jurors faithfully executed their duties.

Appellant's second claim concerns comments made by the prosecutor regarding the legality of a fully automatic AK-47 assault rifle. Specifically, he complains about the assistant district attorney's references during closing argument that ownership of an AK-47 was illegal and asks for a new trial. The prosecutor stated that the AK-47 in this case was "in all likelihood, fully automatic and highly illegal." N.T., 6/12/14, at 62. Appellant objected, stating that a fully automatic AK-47 can be purchased at Wal-Mart. *Id*. The prosecutor disagreed, responding "I invite you to go to a Wal-Mart and ask the clerk behind the counter if you could buy a fully automatic AK-47, and see what he says[.]" *Id*. Counsel did not respond, nor did he request a cautionary instruction or a mistrial. Judge O'Neill did not take any action. The summation continued. Later, the prosecutor again referenced the legality of an AK-47. "If it is fully automatic, it is illegal. But if it is semi-automatic, you can buy a semi-automatic AK-47 in a store." *Id*. at 103. Appellant did not object to this statement.

Appellant argues that the ADA introduced facts not in evidence, and highlights that some fully automatic AK-47s remain legal under federal law. Appellant's brief at 13 (citing the National Firearms Act). Thus, according to Appellant, a fully automatic firearm in question is theoretically legal. He requests a new trial "because the court did not overrule the prosecutor's statement that an AK-47 is *per se* illegal." Appellant's brief at 15.

We find this claim waived. Appellant did not request a mistrial when objecting to these remarks, nor did he request a cautionary instruction from the judge in response to the prosecutor's comments. "In order to preserve a claim of prosecutorial misconduct for appeal, a defendant must make an objection and move for a mistrial." *Commonwealth v. Sasse*, 921 A.2d 1229, 1238 (Pa.Super. 2007). Since Appellant failed to do so, the claim is waived.

Even if not waived, we would not find the comments prejudiced the jury's deliberations. "Generally, a prosecutor's arguments to the jury are not a basis for the granting of a new trial unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility towards the accused which would prevent them from properly weighing the evidence and rendering a true verdict." *Commonwealth v. Rolan*, 964 A.2d 398, 410 (Pa.Super. 2008). We note that the prosecutor delineated that a fully automatic AK-47 is illegal while a semi-automatic one is not. The jury was aware that the firearm in question was never recovered, a fact the prosecutor acknowledged during his summation. N.T., 6/12/14, at 103. In this regard, we note that the legal status of the firearm was of little import. Defense counsel did not dispute that an AK-47 was the murder weapon. The critical question the jury had to

decide was who fired the AK-47.  Counsel argued that Appellant, who owned several legal firearms, did not own the AK-47.[4]  "[T]he evidence says that this man never, ever bought an AK-47 which is the murder weapon in this case."  N.T., 6/13/14, at 24.  He suggested Hernandez was the killer.  "Paul Hernandez who had the gun in his house wasn't going to transport an AK-47 all around town.  Every time it was ever seen by anybody was at Paul Hernandez' house.  Paul Hernandez is guilty of this crime."  *Id*. at 28.  We would not find the distinction between an illegal versus legal firearm played any role in the jury's verdict.  This case rested on the credibility of the eyewitnesses to the murder.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/21/2016

_____

[4]  The parties stipulated that Appellant lawfully purchased several firearms. N.T., 6/11/14, at 107-08.